**WILLIAM A. SMITH CONTRACTING CO., Inc. OF MISSOURI, and Brown & Root, Inc.**

v.

**UNITED STATES.**

No. 264–57.

United States Court of Claims.

July 19, 1961.

848

Morgan Hunter, Austin Tex., for plaintiffs; Powell, Rauhut, McGinnis, Reavley & Lochridge, Austin, Tex., on the brief.

Kendall M. Barnes, Washington, D. C., with whom was Asst. Atty. Gen. William H. Orrick, Jr., for defendant.

PER CURIAM.

This case was referred pursuant to Rule 45, 28 U.S.C.A. to W. Ney Evans, a trial commissioner of this court, with directions to make findings of fact and recommendations for conclusions of law. The commissioner has done so in a report filed October 24, 1960. Briefs and exceptions to the commissioner's findings were filed by both parties, and the case was submitted to the court on oral argument by counsel. Since, after full consideration of the record, the court is in agreement with the findings and recommendations of the trial commissioner as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiffs are therefore entitled to recover and judgment will be entered for plaintiffs in the sum of $35,-796.01.

It is so ordered.

Opinion of Commissioner.

In March 1949, the Alaska Railroad issued invitations for bids on two contracts for the rehabilitation of its tracks. Plaintiffs, corporate joint venturers, submitted the successful bids and were awarded both contracts. The appropriations on which the Railroad relied were delayed, and the work was postponed until 1950. The contracts were executed on February 7, 1950.

One contract (identified as No. 8567, and sometimes referred to as the embankment contract) called for the widening of the subsurface embankment upon which the track rested, together with some track raising, realignment, and renewal of ballast, in six specified work sections.

The other contract (identified as No. 8568, and sometimes referred to as the relay contract) called for replacing 70-pound rail with 115-pound rail in two work sections.

While work was done on both contracts in 1950, none (except for a minor segment not material here) was done during that season on the section in controversy, which was described in the embankment contract (No. 8567) as work section 6, extending south 12.9 miles from Anchorage to Potter.

Among the requirements on work section 6 in Contract 8567 were "the raising of the entire track and the elimination of numerous sags."

This contract also gave the "location and description of borrow pits in relation to work sections," including two which were specifically related to work section 6, both of which were said to contain gravel suitable for track raising as well as bank widening. One of these borrow pits was at milepost 106, adjacent to Turnagain siding, and is described in the findings as the Campbell pit. The other "pit" was a high embankment at milepost 116, at the northern end of the Anchorage Yard, and was known as the Anchorage Yard pit.

In August 1950, the Railroad decided that it would be advantageous to increase the emphasis upon rail replacement and track raising, and to use the funds available for Contract 8567 for that purpose. To this end the Railroad proposed and the contractor agreed to an arrangement for the termination of Contract 8567, thereby permitting the transfer of funds to Contract 8568, under which much of the track raising required by Contract 8567 (including the section in controversy) would be carried forward.

Extensive negotiations, oral and written, followed in ironing out the details of the new arrangement. The Railroad surveyed its needs and determined what work should be done where. Careful attention was given to the accounting details requisite to the termination of Contract 8567. Representatives of the contractor met twice with the contracting officer for extended discussions of the nature and locations of the revised assignments and the methods of accomplishing the work.

At the second of these conferences, in Portland, Oregon, in March 1951, discussions were held as to the source of ballast material to be used in the Potter to Anchorage work section. Among the contractor's representatives there was some preference for the pit in the Anchorage Yard. The contracting officer, however, preferred Campbell pit, as a means of obviating the necessity of moving the work trains through the classification yard. The Anchorage pit was at the north end of the classification yard, 2 miles from

the northern terminus of the work section. The Campbell pit was located approximately midway in the work section. Plaintiffs' representatives therefore agreed to the use of the Campbell pit, and specified it on their progress chart, which was submitted to the contracting officer a few days after the conference.

Immediately after the conference the parties executed the requisite contract documents, terminating Contract 8567 and amplifying Contract 8568.

The supplemental agreement extending and amplifying Contract 8568 provided (as additional work) for "approximately 103 miles of ballasting, raising, lining and dressing" of track (without further breakdown of work sections), listed "approximate quantities" of items for the 103 miles as a whole, specified units and unit prices, and extended the dollar amounts based on quantities and unit prices. The specifications of Contract 8567 were carried over into Contract 8568 for a limited purpose only, which did not include application to the track raising between Potter and Anchorage.

Under these circumstances the termination of Contract 8567 resulted in the elimination from the contract documents of the appellation of work section 6 and its milepost designations together with the specifications of Contract 8567 applicable thereto, including the designation of borrow pits "related" to the section.

The 103 miles of track raising included the portion which had been work section 6 under the terminated contract. This fact is established by agreement of the parties. Absent such agreement, support for the inclusion of the section in controversy could be found only in matter *de hors* the written contract, including the correspondence and the course of conduct of the parties.

Another provision of Contract 8568, as modified, moved the completion date forward to December 1, 1951.

Among the provisions and specifications of Contract 8568 (as modified) ap-

plicable to the track raising between Potter and Anchorage were: (1) the agreement of the Railroad to furnish work train service, including locomotives and ballast cars;[1] and (2) standards for the content (sizes of gravel) of ballast material. Also retained in the modified contract was a provision which in context was related to the two "approved ballast pit locations" described in the original Contract 8568 for relay work north of Anchorage (nearer Fairbanks) as follows:

"* * * If the Contractor can find equally as suitable ballast deposits more convenient to his work locations, The Alaska Railroad will assist him in developing such ballast pits, providing the ballast meets with the approval and requirements of the Engineer. * * *"

There is no evidence to suggest that the elimination of the descriptions of the Campbell and the Anchorage Yard pits, as sources of ballast "related" to the Potter to Anchorage work section, was discussed or agreed between the parties in the preparation and execution of the modified contract documents. On the contrary, the inferences are that the Railroad, in preparing the documents, centered attention upon the accounting between it and the contractor and upon specifying the work to be done; and that the contractor, having satisfied itself as to the accounting, and being content with the oral discussions of what work was to be done and how and in what sequence it was to be done, signed the contract documents without being specifically aware of the deletions or their possible effect from the contractor's standpoint.

Work under the revised contractual arrangement was begun by the contractor in 1951 as soon as the weather permitted. Whereas the plan had been for starting the work around the middle of May, the continued presence of frost in the ground and other incidentals delayed the start of the work until June 1. These 2 weeks of delay were never made up. Whereas the contractor had planned to begin on the section from Potter to Anchorage on September 1, it was not ready to do so until September 15.

Defendant contends that, because of this delay in starting, and because of the arrival of freezing weather earlier than usual in the fall of 1951, the contractor could not have finished the Potter to Anchorage section during the 1951 work season in any event. The facts do not bear out the contention. If the contractor had not encountered the delay hereinafter described, it could have completed the work between Potter and Anchorage during the 1951 season, and would not have had a carryover to the 1952 season.

Plaintiffs now sue for the additional costs incurred by them as a result of delay in 1951 which they attribute to the fault of the Railroad.

In March 1951 the Alaska Railroad transferred to the Alaska Housing Authority a tract of land lying within the Railroad's terminal reserve. This tract was situated on top of the mesa, the western boundary of which was the long, high embankment which comprised the Anchorage Yard pit. The Railroad undertook to limit the use of the gravel pit so that the top of the slope would not encroach or advance beyond 60 feet of the Housing Authority's tract.

During the summer of 1951, the Railroad withdrew from the Campbell pit 42,928 cubic yards of ballast material for use in a section immediately south of Potter. This section was under contract to a contractor other than plaintiffs. In that contract the Railroad had undertaken to load and haul ballast to the jobsite. The contract did not specify the source from which the ballast material would be taken.

The quantity so withdrawn exceeded the 40,498 cubic yards ultimately required for ballast in the Potter to Anchorage section.

---

1. The contractor was to load and dump the ballast. The Railroad provided the work trains, including operation as well as equipment.

In the process of removing the 42,928 cubic yards of gravel from the Campbell pit, sand lenses were found to be so extensive in the underlying strata as to render Campbell pit of doubtful utility as a source of additional ballast material.

Sometime in August 1951, plaintiffs entered into two additional contracts with the Railroad: one for the grading and drainage of the Anchorage Yard; and one (on force account) for removing a scrap heap from the face of the gravel embankment in the Yard.

Toward the end of August the contractor's superintendent informed the Railroad's project engineer that he proposed to commence work on the Potter to Anchorage section about September 15 and would bring down from the north 10 ballast cars to haul ballast out of Campbell pit. In reply he was told that the contractor would not be permitted to use the Campbell pit but would have to go to the Spencer pit for the Potter to Anchorage ballast.

The Spencer pit was at milepost 55, which was 45.8 miles from the southern terminus and 58.97 miles from the northern terminus of the Potter to Anchorage section, representing an average haul of 52.4 miles as contrasted with average hauls of 3.3 miles and 7.6 miles from the Campbell pit and the Anchorage Yard pit, respectively.

It would not have been economically feasible to have begun the haul from Spencer with 10 ballast cars, which were all the contractor could spare on September 15 from the work then being completed north of Anchorage. The week or 10 days which elapsed after September 15 before the contractor could release additional cars in substantial numbers were crucial to its plans.

Correspondence between the contractor and the Railroad ensued, the contractor demanding to be permitted to use the Anchorage Yard pit, if the Campbell pit no longer contained suitable material, and the Railroad remaining adamant in its instructions to the contractor to go to Spencer for the material.

The reason given by the contracting officer for refusing the contractor the use of the Anchorage Yard pit was that "this pit is not available as the material which we originally contemplated using for ballast is now being used by your company for fill * * * in the Anchorage Yard Grading and Drainage Project."

The findings show that suitable material was available in Anchorage Yard pit in quantities sufficient for both the grading and drainage project and the Potter to Anchorage ballast without encroachment upon the 60-foot limit imposed for the benefit of the housing tract and without impediment from the scrap removal job.

The contracting officer never questioned the suitability of the material in the Anchorage Yard pit. Ballast could have been taken from there as pit-run gravel, without screening. Mixing, if found necessary, could have been done with a bulldozer at the base of the embankment.

On September 18, 1951, the contractor advised the contracting officer that it would "expect to be reimbursed for any and all additional costs or expenses made necessary by this change in plans," and proceeded to Spencer.

The pit at Spencer was at the terminal moraine of a glacier. Oversize rock was mixed with the gravel in such quantities as to require screening with a grizzly. The dragline (used instead of a shovel because of the grizzly) picked up loosened material at the base of the gravelface, where quantities of water had accumulated. As a consequence the ballast material was quite wet.

Freezing weather began earlier than usual in the fall of 1951. As the work train service out of Spencer pit was operated, ballast was left in the cars overnight. As the freeze continued, loaded cars had to be taken to thawing sheds before they could be unloaded. Further effort to obtain ballast from Spencer pit was abandoned on October 14. Some 503 cars, containing 17,473 cubic yards of ballast, had been loaded and dispatched.

The contracting officer made an inspection of the work on October 25 and 26, and found the subgrade frozen to depths of 8 to 16 inches. He indicated to the contractor that work on frozen subgrade would not be accepted. Inasmuch, however, as the weather had then moderated somewhat, he withheld the issuance of a stop order "in the hope that we would * * * be able to complete * * * the work." Four days later, on October 30, he ordered the contractor to suspend operations "until such time as the roadbed * * * is completely free of frost," adding that the time of completion of the contract would be extended accordingly.

The contractor suspended operations immediately, until the summer of 1952, when the work was resumed and completed to the satisfaction of the contracting officer.

The carryover to 1952 would not have been necessary, and some of the expenses incurred by the contractor in the performance of the Potter to Anchorage work would not have been incurred, if the Railroad had left the Campbell pit undisturbed and had permitted the contractor to use it, or if the Railroad had permitted the contractor to take the ballast from the Anchorage Yard pit.

The question is whether or not the Railroad (defendant) is legally responsible for the consequences of its actions in depriving plaintiffs of the use of the Campbell pit and in refusing them the use of the Anchorage Yard pit.

◼ Barling v. United States, 1953, 111 F.Supp. 878, 126 Ct.Cl. 34, points up fault on the part of the Government in causing delay as a requisite of liability for the consequences of such delay. Absent fault or negligence, there is no liability. United States v. Howard P. Foley Co., 1946, 329 U.S. 64, 67 S.Ct. 154, 91 L. Ed. 44. In Barling the court found that the Government had "exercised great diligence in an effort to secure steel for the plaintiff as needed, and * * * its inability to do so was not attributable to any fault or negligence on its part." [111 F.Supp. 880.]

The series of cases wherein the Government has been held liable for the consequences of delay caused by fault or negligence on its part include: George A. Fuller Co. v. United States, 1947, 69 F. Supp. 409, 415, 108 Ct.Cl. 70, where the Government was tardy, without "an excusable reason," in furnishing models for the Archives Building; Kehm Corporation v. United States, 1950, 93 F. Supp. 620, 624, 119 Ct.Cl. 454, where the Navy was "far from diligent" in supplying tail assemblies for bombs the plaintiff was to manufacture; Chalender v. United States, 1954, 119 F.Supp. 186, 190, 127 Ct.Cl. 557, where the Army Engineers were "negligent, not only in failing to use due diligence in expediting delivery of materials [plumbing fittings for a construction job] * * * but in their failure to place their purchase orders so as to permit timely delivery * * *"; Ozark Dam Constructors v. United States, 1955, 127 F.Supp. 187, 191, 130 Ct.Cl. 354, where again the Army Engineers showed "a complete lack of consideration for the interests of the plaintiffs" in their failure to make provision for timely delivery of cement; Peter Kiewit Sons' Co. et al. v. United States, 1957, 151 F.Supp. 726, 731, 138 Ct.Cl. 668, where the Bureau of Reclamation "acted without proper and adequate consideration for the interests of the plaintiffs" in its failure to provide a penstock for the dam under construction; and Volentine and Littleton v. United States, Ct.Cl., 169 F.Supp. 263, 265, where the Army Engineers were "completely inconsiderate of the interests of the plaintiff" in closing a cofferdam with less than 24 hours' notice, thereby flooding land plaintiff was clearing.

◼ In the instant case the evidence makes it abundantly clear that the Alaska Railroad "acted without proper and adequate consideration for the interests of the plaintiffs," within the meaning of the cited cases, in stripping the Campbell pit of usable ballast material and

then denying plaintiffs the use of the Anchorage Yard pit as a substitute.

The Government, in its contracts with the claimants in the cited cases, had expressly undertaken to furnish Fuller with the models for the Archives Building; to supply the tail assemblies to Kehm Corporation; and to provide the plumbing fixtures for Chalender, the cement for the Ozark Dam Constructors, and the penstock for Kiewit.

Liability, in these cases, was based upon a breach by the Government of its contract to furnish the models, or to supply the tail assemblies, or to provide the fittings, the cement, or the penstock.

The unusual twist in the instant case is that the governing contract documents (Contract 8568 as modified) contained no undertaking by the Railroad to furnish ballast, or even to make available either of the borrow pits now in controversy. All references to ballast, as "related" to the Potter to Anchorage work section, were eliminated by the termination of Contract 8567.

Plaintiffs contend in their briefs that a breach of contract resulted from the defendant's failure to furnish adequate work train service with which to move the requisite ballast from Spencer pit to the jobsite. The facts indicate that defendant met its obligation to furnish work train service as fully as the extent and condition of the Railroad's equipment would allow.

Plaintiffs restate the contention in terms of a breach of contract resulting from defendant's failure to coordinate the ballast pit location which it would approve with the work train service it was prepared to furnish. The weakness of this position lies in defendant's obvious answer that, on the facts, plaintiffs had failed to coordinate their use of the available work train service with the location of the ballast pit which the Railroad did approve.

In Volentine and Littleton, supra, the Government had no contractual obligation to furnish materials or supplies. The contractor in that case undertook to clear an area of land which was ultimately to be flooded by the rise of water behind a dam. Defendant flooded some of the land before the plaintiff had cleared it. The court said that this "inconsiderate conduct was a breach of that term which every contract contains, by fair implication, that one party to a contract will not impede performance by the other."

While the action of the Railroad, in the instant case, in stripping the Campbell pit and refusing plaintiffs the use of the Anchorage Yard pit in its stead, was inconsiderate conduct, it does not follow that the action was such as to impede performance by the contractor within the meaning of Volentine and Littleton. When the Army Engineers in that case entered into the contract for clearing the land, there was an implied representation, if not a promise, that the land was and would remain, for the purposes of the contract, available for clearing without action by defendant to render it unavailable or to impede access to it. Such an obligation is implicit in "that term which every contract contains * * that one party * * * will not impede performance by the other."

In the Barling case, supra, where the court found "no evidence that the defendant was in any way at fault in failing to exert its best efforts to obtain the steel it had agreed to furnish," the plaintiff countered that, although there may have been no breach by defendant of obligations imposed by the contract, defendant had warranted that it would furnish the steel, and that its failure to do so was a breach of warranty. For evidence of the warranty, plaintiff relied on statements made to him by representatives of defendant.[2]

2. The court was "not convinced that the statements relied on by plaintiff can properly be interpreted as establishing a warranty * * *," but said that assuming the statements relied upon did constitute a warranty, "it would be ineffectual because made without authority."

In the instant case the contracting officer agreed with representatives of the plaintiffs at the Portland conference in March 1951, before the execution of the modified contract documents: (1) that the work section of Potter to Anchorage would be retained as part of the contract work, being one segment of the 103 miles of track raising which was to become additional work under Contract 8568; and (2) that the Campbell pit should be used as the source of ballast for the Potter to Anchorage work section.

When the contract documents were signed, they contained no specific reference to the Potter to Anchorage work section and no mention of the Campbell pit.

It seems rather technical for defendant to contend that plaintiffs were bound by the contract to continue the Potter to Anchorage work section, but that the Railroad was relieved of its obligation with respect to the ballast pit. In the formal writings details were lacking as to either obligation.

It is my conclusion that the Railroad was under obligation to provide Campbell pit as the source of ballast for the Potter to Anchorage work. Whether that obligation was part of the contract, by implication and intendment although not written, as was plaintiffs' obligation to perform the Potter to Anchorage work, or whether the obligation rested on the contracting officer's warranty,[3] is not so material as to justify extended discussion.

It follows that defendant breached its obligation to plaintiffs when it stripped the Campbell pit of usable ballast material for delivery to another contractor, thereby depriving plaintiffs of the use of the pit.

Plaintiffs' request for permission to use the Anchorage Yard pit, after the use of the Campbell pit was denied, was, in effect, an offer to substitute Anchorage Yard for Campbell in fulfillment of the Railroad's obligation. The refusal of the Anchorage Yard pit, under the circumstances, confirmed the breach of the Railroad's initial obligation.

The breach of obligation by the Railroad caused the delay in completion of the work of which plaintiffs complain, and the delay caused plaintiffs to incur costs of performance in excess of the costs that would have been incurred had there been no delay. Plaintiffs are entitled to recover their increased costs, which have been found to total $35,796.-01.

---

3. The contracting officer, unlike the Government representative in Barling, supra, was not without authority to make a binding warranty.