WhitaKee, Judge,
delivered the opinion of the court:
Plaintiff sues for damages alleged to have been incurred by a delay in the delivery of the site upon which it had contracted to erect a transit shed. The question presented is whether the Government guaranteed the availability of the site by any particular time.
In its contract, plaintiff agreed to build a warehouse, a transit shed[1] and related utilities systems at the Naval Sup *349 ply Depot in Newport, Rhode Island. The warehouse was to be built on existing land, but, at the time the contract was signed, the site where the transit shed was to be erected was an arm of Narrangansett Bay. As plaintiff’s contract specified, the site was to be filled in by another contractor, the Raymond Concrete Pile Company (hereinafter referred to as “Raymond”). Plaintiff’s contract stated that Raymond would complete the fill and that the site would be ready for plaintiff on November 22,1954.
However, Raymond was delayed in preparing the site, principally on account of two major hurricanes that swept through the area in October and November of 1954 and by the necessity for complying with change orders necessitated in part by the hurricanes’ havoc. As a consequence, the site was not ready for plaintiff to begin building the transit shed until late in the spring of the following year,[2] and plaintiff did not actually commence operations on it until June 1,1955.
The damages that plaintiff claims stem entirely from this delay in delivery of the transit shed site. In its petition and its opening statement at the trial, plaintiff asserted a cause of action based upon a stop order that defendant issued, an order which prevented plaintiff from doing any work on the transit shed from June 28, 1955 to July 20, 1955. The purpose of issuing the stop order was to permit the Government to alter the specifications to meet an unexpected soil condition, which, it would seem, it had a right to do under its reserved power to make changes. In its brief, plaintiff did not further press this claim, and we have assumed that it has been abandoned. Plaintiff did not make an oral argument, having elected to submit the case upon its brief.
*350 The trial commissioner has found that none of the delay in filling in the site can be attributed to any fault or negligence on defendant’s part, which is fully supported by the evidence.[3]
The issue then is, whether defendant is liable for Raymond’s delay even though it did not wrongfully cause it. Such liability, if it exists at all, must be found in the express language of the contract; it cannot arise solely by implication. As the Supreme Court said in H. E. Crook Co. v. United States, 270 U.S. 4 (1926), the seminal case in this area, it is not within the realm of normal expectation that the Government would voluntarily stand as a guarantor of the performance of his contract by another contractor within the specified time. To the same effect are United States v. Rice, 317 U.S. 61 (1942), and United States v. Foley, 329 U.S. 64 (1946).
These cases involved the standard form of government construction contract, quite similar to the one involved here. In the Rice case, the Supreme Court concluded its discussion of this feature of the case with these words, at page 65:
Decisions of this Court prior to the Crook case also make it clear that contracts such as this do not bind the Government to have the property ready for work by a contractor at a particular time. Wells Bros. Co. v. United States, 254 U.S. 83, 86; Chouteau v. United States, supra [95 U.S. 61 (1877)]; cf. United States v. Smith, 94 U.S. 214, 217.
In Foley, an electrical contractor was delayed because the dredging contractor was delayed in filling in the site for the Washington National Airport, and did not have it ready *351 on time, which delayed the electrical contractor in installing lights along the runways. The Supreme Court said, at page 67:
* * * the Government cannot be held liable unless the contract can be interpreted to imply an unqualified warranty to make runways promptly available.
We can find no such warranty if we are to be consistent with our Oroole and Bice decisions, supra. * * *
Plaintiff relies on paragraph 1-26 of the specifications to show the defendent did warrant that the site would be available at the specified time. It reads:
Preparation, of Transit Shed Site. The installation of steel sheet bulkhead and the fill in the Transit Shed Area is being accomplished under another contract and will be completed and the site available to commence the work specified under this contract on November 22, 1954. The work to be performed under this contract in the Transit Shed Area shall be scheduled, with due consideration given to the date of availability of the site and completion within the time stipulated in subsection 1-06 “Time for Completion.”
These are not words of warranty. The defendant represented that the site would be available at a specified time, but it did not guarantee that it would be. Other provisions of the contract and specifications show that it was expected that it might not be. Paragraph 1-07 of the specifications, entitled Damages for Delay, provides in part:
* * * if the site preparation work at the Transit Shed area under contract NOy 73788 is delayed to such an extent that the contractor is unable to complete the work within the time specified, the delay will be considered an act caused by the Government, and as such will be excusable within the meaning of clause 5.
Clause 5 (c) of the General Provisions of the contract reads as follows:
The right of the Contractor .to proceed shall not be terminated, as provided in paragraph (a) hereof, nor the Contractor charged with liquidated or actual damages, as provided in paragraph (b) hereof because of any delays in the completion of the work due to unforeseeable *352 causes beyond the control and without the fault or negligence of the Contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Government, either in its sovereign or contractual capacity, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather, or delays of subcontractors or suppliers due to such causes: Provided, That the Contractor shall within 10 days from the beginning of any such delay, unless the Contracting Officer shall grant a further period of time prior to the date of final settlement of the contract, notify the Contracting Officer in writing of the causes of delay. The Contracting Officer shall ascertain the facts and the extent of the delay and shall extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal as provided in Clause 6 hereof [the disputes clause]. [Italics added.]
These two provisions show that delays in the preparation of the site were in contemplation of the parties, and, hence, disprove the assertion that defendant guaranteed that it would be ready on the completion date fixed in the contract for filling in the site.
In both the Rice and Foley cases the defendant had given the contractor notice .to proceed, although the prior work was not in condition for him to proceed, and still the Supreme Court held the defendant was not liable for the incident delay. A fortiori, defendant is not liable in this case.
The type of work involved in the Raymond contract was peculiarly susceptible of being delayed, and both parties must have realized it. The dredging and filling of land out of an arm of the Atlantic Ocean is not an operation the duration of which can be ascertained in advance with great precision. We must also bear in mind that the locale of this project was an area frequently subject to heavy weather. In these circumstances, the defendant would not have been likely to assent to a firm date for the availability of the site and to guarantee that date, absolutely and in all events.
This view is in accord with our opinion in Stafford v. United States, 109 Ct. Cl. 479, 74 F. Supp. 155 (1947), where we refused to hold .the Government liable for a contractor’s *353 increased costs after be bad been delayed in starting work. There, the delay was found to have resulted from a labor dispute that had prevented another contractor from completing the site upon which plaintiff had contracted to plant nursery stock on the date the contract said plaintiff was to start. See also Kehm Corp. v. United States, 119 Ct. Cl. 454, 93 F. Supp. 620 (1950).
We therefore hold that plaintiff is not entitled to recover and its petition is dismissed.
KtNDINGS OP PACT
The court, having considered the evidence, the report of Trial Commissioner Richard Arens, and the briefs of counsel, makes findings of fact as follows:
1. (a) Plaintiff, a Rhode Island corporation with its principal place of business in Providence, Rhode Island, is and has been since its organization in 1873 engaged in the construction business.
(b) Plaintiff claims damages which it asserts resulted from delay owing to (1) the non-availability for a certain period of time of a site on which plaintiff constructed a transit shed, and (2) an order issued by defendant stopping construction on the transit shed from June 28,1955 to July 20, 1955. It has not pressed the latter claim in its brief.
2. (a) On April 26, 1954, defendant, acting through the Bureau of Yards and Docks, Department of the Navy, invited bids for the construction of a warehouse and a transit shed at the United States Naval Supply Depot, Newport, Rhode Island. Both the warehouse and the transit shed were to be 1-story buildings with structural steel frames, side walls of precast concrete slabs, and metal roofs. The warehouse, 810 x 200 feet, was to be constructed on existing land and was to have more than five times the floor area as the transit shed, 302.6 x 101.33 feet which was to be constructed on a 4-acre site located on what was then the waters of Narragansett Bay but which was to be filled in by another contractor, Raymond Concrete Pile Company. The two buildings were to be separated by a road and were to be approximately 200 yards apart. The transit shed site was *354 accordingly at all times readily viewable from the warehouse site.
(b) The contract specifications and an addendum which were made available to bidders read in part as follows:
SectioN 1. General Clauses. (Cont’d)
1-02. General Description. (Cont’d)
(c) Site Work. (Cont’d)
1. The site preparation work at the Transit Shed site shall be accomplished under another contract — “Fleet Berthing Facilities”, XJ.S. Naval Base, Newport, Bhode Island, contract NOy 73188, specification no. 34829; except that under this contract the pavement, sewer, water, steam, and electric distribution shall be constructed.
1-26. Preparation of Transit Shed Site. The installation of steel sheet pile bulkhead and the fill in the Transit Shed Area is being accomplished under another contract and will be completed and the site available to commence the work specified under this contract on November 22, 1954. The work to be performed under this contract in the Transit Shed Area shall be scheduled with due consideration given to the date of availability of the site and completion within the time stipulated in subsection 1-06 “Time for Completion.”
(c) The contract, referred to in the foregoing language of the specifications and addendum (designated contract NOy-73788), was entered into under date of May 20,1954, between defendant and Eaymond Concrete Pile Company for the construction of fleet berthing facilities at the Naval Supply Depot, Newport, Bhode Island, for a total contract price of $3,332,295. Plaintiff had no actual knowledge of the terms and conditions of this contract, which included provisions for the construction of a 1350 x 100 foot pier having a concrete deck supported on concrete-filled steel pipe piles, a steel sheet piling bulkhead 700 feet long, a bituminous access road to the new pier, and for construction of certain facilities. The contract provided that the installation of the steel sheet piling bulkhead and the fill in the transit shed area was to be completed on November 21, 1954, and that the remainder of the work was to be completed by August 18, 1955.
*355 (d) The contract between defendant and Raymond Concrete Pile Company contained the general provisions of Standard Form 23A, prescribed in March 1953 by the General Services Administration, which were the same as those general provisions contained in the contract between defendant and plaintiff (finding 4(b), infra).
(e) The specifications, together with an addendum of the contract between defendant and Raymond Concrete Pile Company, read in part as follows:
■b. Wharfing improvements at the site of the future Transit Shed will include dredging, construction of lateral sand dike, riprap, construction of steel sheet piling bulkhead approximately 660 feet long, filling behind bulkhead and dike with dredged material, drainage system, hauled-in sand and gravel fill, construction of wood bumper and fender piles and relocating personnel float.
‡ ‡ ‡
1-06. Time for completion. The parts of the work shall be completed within the following number of calendar days after the date of receipt of a notice of award or other communication authorizing the contractor to proceed:
a. Installation of steel sheet pile bulkhead, and the fill in the Transit Shed Area_180
b. All other -work_450
1-07. Damages for delay. Line 2, delete “rate of $1050.00 per calendar day” and insert “following rates per calendar day for the parts of the work defined in the preceding paragraph:
a._$500.00
b._$975. 00
% # % ^ í|í
4-06. Oold weather restrictions. Hydraulic fill shall not be placed between December 1 and April 1, nor at other times or periods when, in the opinion of the officer in charge, the weather is such as to interfere with proper construction. No frozen material shall be used in the construction of the hydraulic earth fills nor shall materials be dumped or sluiced on surfaces which are frozen or upon banks which are frozen.
3. (a) On June 8, 1954, plaintiff submitted its bid in the sum of $1,509,955 for the construction of the transit shed and the warehouse. The contract price for the transit shed *356 was $224,583 and the contract price for the warehouse was $934,357. The additional $351,015 making up the total bid of $1,509,955 was for general overall site work, including grading, construction of roadways, demolition and removal of existing buildings, installation of railroad switch and spur, reconstruction of fences, and construction of certain utilities and electrical work. A small amount of this aforementioned general site work was to be performed by plaintiff at both sites but, as heretofore indicated, the site preparation work at the transit shed site was to be accomplished by Raymond Concrete Pile Company.
(b) About June 15, 1954, Raymond Concrete Pile Company, under its contract with defendant, began work of preparing the transit shed site.
(c) By letter dated June 22, 1954, addressed to plaintiff, defendant accepted plaintiff’s bid and notified plaintiff that the contract completion date would be December 21, 1955, that the formal contract would be prepared on the standard contract form of the Bureau of Yards and Docks of the Department of the Navy, with such modification therein as the Bureau might determine proper under the particular circumstances, and directed plaintiff to proceed with the work pending execution of the formal contract.
4. (a) The formal contract between defendant and plaintiff (designated contract NOy-79817) was prepared by defendant and was executed as of June 22, 1954.
(b) As heretofore indicated, the contract between defendant and plaintiff contained the same general provisions which were included in the contract between defendant and Raymond Concrete Pile Company, including the following:
3. CHANGES
The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim of the Contractor for adjustment under this clause must be asserted in writing within 30 days from the date of receipt by the Contractor of the notification of *357 change: Provided, however, That the Contracting Officer, if he determines that the facts justify such action, may receive and consider, and adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Clause 6 hereof. But nothing provided in this clause shall excuse the Contractor from proceeding with the prosecution of the work as changed. Except as otherwise herein provided, no charge for any extra work or material will be allowed.
4. CHANGED CONDITIONS
The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) subsurf ace or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do so materially differ and cause an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made and the contract modified in writing accordingly. Any claim of the Contractor for adjustment hereunder shall not be allowed unless he has given notice as above required; provided that the Contracting Officer may, if he determines the facts so justify, consider and adjust any such claim asserted before the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Clause 6 hereof.
5. Termination for default — damages for delat— TIME EXTENSIONS
* * % H* #
(c) The right of the Contractor to proceed shall not be terminated, as provided in paragraph (a) hereof, nor the Contractor charged with liquidated or actual damages, as provided in paragraph (b) hereof because of any delays in the completion of the work due to unforeseeable causes beyond the control and without the fault or negligence of the Contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Government, in either its sovereign or contractual capacity, acts of another contractor in the performance *358 of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather, or delays of subcontractors or suppliers due to such causes: Provided, That the Contractor shall within 10 days from the beginning of any such delay, unless the Contracting Officer shall grant a further period of time prior to the date of final settlement of the contract, notify the Contracting Officer in writing of the causes of delay. The Contract-Officer shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal as provided in Clause 6 hereof.
6. Disputes
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the head of the department, and the decision of the head of the department or his duly authorized representatives for the hearings of such appeals shall, unless determined by a court of competent jurisdiction to have been fraudulent, arbitrary, capricious, or so grossly erroneous as necessarily to imply bad faith, be final and conclusive: Provided, That, if no such appeal to the head of the department is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.
Hi H< #
57. Disputes
Clause 6 is amended by adding the following sentence:
Notwithstanding the provisions of Clause 6, the Contractor shall have such right of appeal to the Court of Claims as is provided by Section 635, Public Law 488, 82nd Congress and Section 632, Public Law 179, 83rd Congress.
*359 (c) Tbe specifications of the contract between defendant and plaintiff read in part as follows:
1-06. Time for Completion. The entire work shall be completed within 540 calendar days after date of receipt of a notice of award or any other communication authorizing the contractor to proceed.
1-07. Damages for Delay m accordance with clause 5 of TT.S. standard form no. 23A shall be at the rate of $475.00 per calendar day. The Government will take no action pursuant to clause 5, Liquidated damages, to terminate the right of the contractor to proceed or to assess liquidated or actual damages where the failure of the contractor to complete the work within the time specified elsewhere in this contract is due solely to the operation of the priorities and allocations system and is not otherwise caused by the fault or negligence of the contractor. It is understood and agreed that such delays will he considered an act caused by the Government and as such will be excusable within the meaning of clause 5, and the contractor will be entitled to a time extension by reason thereof. In addition, if the site preparation work at the Transit Shed area under contract NOy 73788 is delayed to such an extent that the contractor is unable to complete the work within the time specified, the delay will be considered an act caused by the Government, and as such will be excusable within the meaning of clause 5.
(d) As appears in detail hereinafter, Change Orders “A” through “M” were issued under the contract between defendant and plaintiff and resulted in an aggregate time extension of 532 days and a net increase in the contract price of $81,671.
5. (a) Plaintiff contends that defendant breached the contract between defendant and plaintiff because the transit shed site was not available to plaintiff on November 22,1954, the date “stipulated in the contract”, and that plaintiff incurred increased costs because of such unavailability of the site.
(b) Defendant admits that the transit shed site was not made available to plaintiff until May 25,1955, but contends defendant was not required under the contract to make the transit shed site available on any particular date and that making the site available was the obligation of Eaymond Concrete Pile Company.
*360 (c) Plaintiff’s progress schedule provided for starting of the warehouse on June 27, 1954, starting of the transit shed about 5 months later on November 22, 1954, and the completion of both buildings on December 21, 1955. The warehouse was accordingly scheduled to take 18 months and the transit shed 13 months for completion. As appears in detail hereinafter:
(1) Although plaintiff started work on the warehouse as scheduled, it was not completed until October 1956. In other words, the warehouse was completed about 28 months after it was started instead of 18 months after it was started, as was provided in the progress schedule.
(2) Plaintiff did not start work on the transit shed until June 1,1955, which was a little more than 6 months after the scheduled starting date. The transit shed was, except for certain corrective, changed, or finish-up work, completed in July 1956. In other words, the transit shed was completed in substantially the same period of time (13 months) from the time it was started, as was provided in the progress schedule.
6. On June 28,1954, plaintiff began the excavation for the foundation of the warehouse and for certain plumbing and drain lines. This work continued through the latter part of September 1954 when plaintiff began the pouring of concrete footings for the warehouse. The pouring of these concrete footings continued until the latter part of October 1954 when plaintiff began the erection of grade beams (foundation walls) for the warehouse. During November 1954 plaintiff continued working on the warehouse, the utilities, and on unloading certain materials.
7. In October and November 1954 Hurricanes “Carol” and “Edna” struck the jobsite. As hereinafter set forth, the hurricanes caused damage to the warehouse, delayed plaintiff’s job progress on the warehouse, delayed Raymond Concrete Pile Company in its work on the transit shed site, and upset the work schedule of The New York, New Haven & Hartford Railroad which was under a subcontract with plaintiff to do rail relocation and bridging work at the jobsite.
*361 8. The transit shed site was not available to plaintiff on November 22, 1954.
9. The body of a letter dated November 23,1954, to defendant’s Resident Officer in Charge of Construction from plaintiff reads as follows:
This letter is a request for an extension of time of completion for the above mentioned contract due to the damage and delays caused by hurricanes “Carol” and “Edna” and the unavoidable delay of the site preparation for the Transit Shed.
The forty day delay of time requested by the Raymond Concrete Pile Company on Contract NOy 73788 for the preparation of the Transit Shed site poses a new problem for the Gilbane Building Company. The Transit Shed site delay forces our operations into additional cold weather construction and holds back storage area which we had planned to use for the materials for this respective building, thereby creating a financial hardship to the Gilbane Building Company.
Considering all the factors mentioned above and the hurricane damage to the Warehouse which has retarded our job progress sixty days, we are requesting a one hundred day extension of time to Contract NOy 79817.
10. (a) The body of a letter dated November 26, 1954, to plaintiff from the Assistant to the Resident Officer in Charge of Construction reads as follows:
At a conference on 20 September 1954, which your Mr. Patterson attended, the question of a 40-day extension of time, due to hurricanes, for the completion of the Raymond Concrete _ Pile Company’s work in the Transit Shed area was discussed.
At that time your Mr. Patterson indicated that such an extension of time, which would cause the Transit Shed area not to be made available to you until 1 December 1954, would not interfere with your schedule. This office has an additional request for extension of time from the Raymond Concrete Pile Company which would cause the Transit Shed area not to be available to you until about 27 January 1955.
In the consideration of this request a letter from you indicating how this would affect your contract completion time and cost, or both, will be needed. It is *362 requested tbat you forward such a letter as soon as possible.
(b) A responding letter dated December 9, 1954, from plaintiff reads in part as follows:
If the transit shed site is not made available to us until January 27, 1955 our scheduling problem becomes more acute than was mentioned in our letter of 23 November 54. Our contract estimate was made for two buildings •being constructed simultaneously giving maximum labor and equipment efficiency by shifting between the two buildings. There is no doubt that a time lag between the completion of the warehouse and the transit shed will cause a financial hardship to the Gilbane Building Company but nothing definite can be shown until both buildings are under construction.
Because of the degree of uncertainty involved we must request a time extension over and above that asked by the Raymond Concrete Pile Company. By our letter of 23 November 1954 we requested a time extension of 100 days based on a 40 day time extension to the Raymond Concrete Pile Company and the damage caused by hurricanes “Carol” and “Edna”. If the transit shed site is not made available to us until 27 January 1955 we are requesting an additional 45 day extension of time. Therefore, by our request of 23 November 1954 and the further extension mentioned above, we request that a total of one hundred forty five days be added to our original contract time of completion.
(c) By letter dated December 17, 1954, plaintiff was advised by the Assistant to the Resident Officer in Charge of Construction that no decision would be made on plaintiff’s request for an extension of time under the contract until such time as the site was actually turned over to plaintiff.
11. On December 14,1954, plaintiff started erecting structural steel for the warehouse. The progress schedule provided for this work to begin in the middle of October 1954 and to be completed December 30, 1954. This work continued through March 1955.
12. The transit shed site was not available to plaintiff on January 27, 1955.
13. On February 2, 1955, defendant issued and on February 3, 1955, plaintiff accepted Change Order “A” for certain concrete work and installation of a gate. The contract price was increased in the amount of $368 and the contract *363 completion date was extended 9 calendar days, to and including December 30, 1955.
14. On February 8, 1955, plaintiff started making the precast concrete wall panels for the warehouse. The progress schedule provided for starting this work on September 1, 1954. On March 29, 1955, plaintiff began the erection of the wall panels for the warehouse. This work continued through the spring of 1955.
15. (a) By letter dated May 4, 1955, the Assistant to the Resident Officer in Charge of Construction notified plaintiff that the transit shed area “is ready for the start of your work.”
(b) A responding letter dated May 6,1955, from plaintiff reads in part as follows:
It is our understanding that this area is still under construction by the Raymond Concrete Pile Company and still requires some seven thousand yards of back fill and grading in the area surrounding the building layout. This, of course, would mean that the Gilbane Building Company would have to store all its material and equipment inside the building lines. This situation would not only hinder and cause an unnecessary financial burden to the Gilbane Building Company but our forces would interfere with the grading operations by Raymond.
In view of these facts we are requesting that the starting date for the Transit Shed construction be moved ahead until the total area is accessible and the Raymond Concrete Company has completed its contract requirements.
(c) In reply, a letter dated May 17,1955, from the Assistant to the Resident Officer in Charge of Construction advised plaintiff “* * * that in the opinion of the Resident Officer in Charge of Construction the remaining operations of the contractor on NOy-73788 should not interfere with the commencement of your operations in the Transit Shed Area. Therefore, you are to consider the area as presently available to you.”
(d) Under date of May 19, 1955, plaintiff replied to the foregoing letter, stating in part:
* * * we wish to state that as of this date if we were to bring in our excavating and pile driving equipment and piles, we would seriously interfere with the operation in progress at this time; namely, the completing of spreading the sand gravel fill over the area, except *364 the building area. This is to be rolled and graded.
The work at cleats and caplog would not interfere with our operation but the grading of site should be completed and we should know what changes are to be made in regard to finish elevation of building and paved areas.
(e) The body of a letter dated May 31, 1955, to plaintiff from the Assistant to the Resident Officer in Charge of Construction reads as follows:
By your letter of 19 May 1955 you expressed concern relative to your operations interfering with the work of the Raymond Concrete Pile Company completing their work in this area.
Confirming verbal notification given your superintendent, Mr. Patterson, on 25 May 1955, you are advised that the entire area is now usably completed. The miscellaneous items remaining will not interfere with your contract work, and you are authorized to proceed therewith.
(f) A responding letter dated June 1, 1955, from plaintiff reads in part as follows:
This availability of jobsite has been confirmed by our Superintendent, Mr. Patterson, and therefore, as of this date, we shall commence field operations for the construction of the Transit Shed.
(g) The contract completion date of the Raymond Concrete Pile Company for installation of the steel sheet pile bulkhead and the fill in the transit shed area was extended by a change order 192 days, to and including June 1, 1955. As appears in finding 25, infra, this change order was issued by defendant on December 22, 1955, and accepted by Raymond Concrete Pile Company January 3,1956. There is no evidence that plaintiff had knowledge of this change order and extension of the contract completion date of the Raymond Concrete Pile Company. There is likewise no evidence that this change order or its basic causes was attributable to any fault or negligence on the part of either defendant or the Raymond Concrete Pile Company.
(h) At the trial plaintiff adduced testimony to the effect that the work of preparing the transit shed site could have been completed and the site made available to plaintiff at an earlier date by a speed-up process requiring a double or triple shift in personnel and premium equipment.
*365 16. On June 10,1955, plaintiff started erecting a steel roof deck for the warehouse. The progress schedule provided for starting this work on February 1,1955.
17. On June 14, 1955, defendant issued and on July 12, 1955, plaintiff accepted Change Order “B” which provided for certain work on both the warehouse and the transit shed. The contract price was increased in the amount of $3,951 and the contract completion date was extended 16 calendar days, to and including January 15, 1956.
18. (a) On June 23,1955, plaintiff’s subcontractor started driving piles which were to total 126 and to be located in 42 clusters of 3 around the perimeter of the transit shed area.
(b) By June 28, 1955, 26 of the foregoing piles had been driven and resulted in the displacement of the filled ground with a consequent springing of the sheet piling which Raymond Concrete Pile 'Company previously had driven to retain the fill. On this date defendant issued a stop order, stopping the driving of the piles until July 15,1955. During the intervening 17-day period, the pile foundations were changed to spread footings. The change was subsequently incorporated in Change Order “M” (finding 44, infra).
(c) There is no evidence that the stop order was attributable to any fault or negligence on the part of either plaintiff or defendant.
19. The body of a letter dated July 7, 1955, to plaintiff from the Assistant to the Resident Officer in Charge of Construction reads as follows:
By various letters and verbal instructions, you have been requested to submit to this office for approval estimates of cost for certain changed work under subject contract.
The elapsed time is disturbingly excessive and makes budgeting and future planning very difficult. In order that future payments may be made, it is requested that a representative of your company visit this office at your earliest convenience to discuss this matter and to insure the proper data being submitted for approval as soon as possible.
20. (a) By letter dated July 15, 1955, the Assistant to the Resident Officer in Charge of Construction authorized plaintiff to proceed with the work involving the change in *366 the pile foundations to spread footings and requested plaintiff to submit its estimate of cost for the change.
(b) The evidence does not establish that defendant was less than diligent in formulating the change and issuing the authorization to plaintiff to proceed with the work involving the change from pile foundations to spread footings.
21. On July 20, 1955, plaintiff started working on the new spread footings for the transit shed and began excavation for the transit shed utilities. By letter of this date, plaintiff submitted to defendant its breakdown of extra costs by reason of Amendment No. 1 to the contract specifications, and requested a 30-day extension of the time for completion of the contract.
22. Plaintiff’s work on both the warehouse and the transit shed continued into the fall of 1955, at which time the floor slab was being laid at the warehouse and the foundations and precast concrete work were underway at the transit shed.
23. (a) The body of a letter dated September 22,1955, to plaintiff from the Assistant to the Besident Officer in Charge of Construction reads as follows:
Your attention is called to the need to expedite your work on water and steam lines under your contract. The difficulties of accomplishing this type of work and the tests and sterilization in cold weather cannot be overemphasized.
The Besident Officer in Charge of Construction cannot entertain appeals for extension of time due to bad weather unless the record shows that the contractor made the ultimate use of good weather.
It is suggested that your entire operation be studied with this thought in mind.
(b) The body of a letter dated September 28, 1955, to plaintiff from the Assistant to the Besident Officer in Charge of Construction reads as follows:
Progress on the construction of the warehouse roof is not satisfactory to the Besident Officer in Charge of Construction. Previous delays have been the result of the unavailability of material, but it is understood that all necessary materials are on the job site at the present time. Further delays in the resumption and completion of this work are not, therefore, anticipated.
*367 24. On October 24, 1955, plaintiff began erection of the structural steel for the transit shed. This work continued simultaneously with the concrete and utility work until December 1955 when the structural steel work was completed.
25. On December 22,1955, defendant issued and on January 3, 1956, Raymond Concrete Pile Company accepted a change order which provided for certain work and for the extension of the contract completion date for installation of the steel sheet pile bulkhead and the fill in the transit shed area 192 calendar days, to and including June 1, 1955.
26. In January 1956 plaintiff started and by February 1, 1956, had finished the erection of the roof for the transit shed.
27. On January 26, 1956, defendant issued and on February 8, 1956, plaintiff accepted Change Order “C” which provided for a change in the gravel base course for the warehouse area. The contract price was decreased in the amount of $1,100 and no change of the contract completion date was made.
28. A letter dated January 31, 1956, from plaintiff to the Resident Officer in Charge of Construction reads in part as follows:
By reason of this change from pile foundations to spread footings, we request a forty-five (45) day extension of time of completion.
Please note that this 45-day extension is in no way connected to the extension of time due for the unavailability of the Transit Shed site on November 22, 1954. Future correspondence will deal with this delay and the resultant increased costs to Gilbane Building Company.
29. On March 21, 1956, plaintiff accepted Change Order “D” which provided for certain drains at the west side of the warehouse. The contract price was increased in the amount of $257 and the contract completion date was extended 3 calendar days, to and including January 18, 1956.
30. On April 2,1956, plaintiff began and on April 23,1956, completed pouring the floor slabs for the transit shed.
31. On April 26,1956, defendant issued and on November 8, 1956, plaintiff accepted Change Order “F” which provided for the omission of certain painting. The contract *368 price was decreased in the amount of $22,700 and no change in the contract completion date was made.
32. On May 2,1956, defendant issued and on May 8,1956, plaintiff accepted Change Order “G” which provided for installation of asphalt tile in both the warehouse and the transit shed. The contract price was increased in the amount of $772 and the contract completion date was extended 15 calendar days, to and including February 12,1956.
33. The body of a letter dated May 3, 1956, to plaintiff from the Assistant to the Eesident Officer in 'Charge of Construction reads as follows:
The progress of the paving work under the subject contract is most unsatisfactory to the Eesident Officer in Charge of Construction. Eecent weather conditions have been very favorable, yet no work has been accomplished on this phase of the construction.
It is requested that this office be advised as to what measures will be taken to correct this condition, and that an anticipated schedule for this phase of the work be forwarded to this office as soon as possible.
34. On May 10, 1956, defendant issued and on May 14, 1956, plaintiff accepted Change Order “E” which provided for certain enclosures around sprinkler valves and additional asphalt pavement. The contract price was increased in the amount of $10,438 and the contract completion date was extended 10 calendar days, to and including January 28,1956.
35. In July 1956 the transit shed was, except for certain corrective, changed, or finish-up work, completed.
36. On August 1,1956, defendant issued and on August 7, 1956, plaintiff accepted Change Order “H” which provided for certain work at both the warehouse and the transit shed. The contract price was increased in the amount of $17,001 and the contract completion date was extended 50 calendar days, to and including April 2,1956.
37. On September 6, 1956, defendant issued and on September 7, 1956, plaintiff accepted Change Order “I” which provided for certain lines to two water fountains and provided for the omission of outside timbers for the railroad flangeway. The contract price was decreased in the amount of $1,215 and no change of the contract completion date was made.
*369 38. On October 10,1956, defendant issued and on October 13, 1956, plaintiff accepted Change Order “J” which provided for revised electrical and mechanical systems. The contract price was increased in the amount of $35,644 and the contract completion date was extended 170 calendar days, to and including September 19,1956.
39. By letter dated October 11, 1956, the Assistant to the Resident Officer in Charge of Construction requested plaintiff to take corrective action regarding the drain of certain asphalt pavement. It was further requested that the work be done at no additional cost to defendant and be completed before the advent of cold weather.
40. On October 26,1956, both the warehouse and the transit shed were accepted by defendant. On this date, as appears in finding 43, infra, pursuant to Change Order “L”, plaintiff’s performance time expired. Although there was some corrective and finish-up work after this date, no liquidated damages were assessed.
41. On November 7,1956, defendant issued and on November 15, 1956, plaintiff accepted Change Order “K” which provided for minor work under the warehouse access road and at the railroad crossing. The contract price was increased in the amount of $1,541 and no change was made in the contract completion date.
42. By letter dated November 21, 1956, the Assistant to the Resident Officer in Charge of Construction directed plaintiff to expedite the completion of remaining items of work without further unnecessary delays.
43. On March 15, 1957, plaintiff accepted Change Order “L” which provided for a number of items of work. The contract price was increased in the amount of $29,100 and the contract completion date was extended 37 calendar days, to and including October 26, 1956.
44. (a) On April 19,1957, defendant issued and on April 24, 1957, plaintiff accepted Change Order “M” which provided for spread footings for the transit shed in lieu of pile foundations and for one additional coat of waterproofing material on certain walls of the warehouse. The contract price was increased in the amount of $1,167 for the waterproofing and $6,547 for the spread footings. The contract *370 completion date was extended 222 calendar days, to and including June 5,1957.
(b) The body of a letter dated May 1, 1957, to the District Public Works Officer from plaintiff, reads as follows:
We are returning two accepted copies of Change “M” covering Amendment #3 and the additional cost of waterproofing to the east and west exterior walls of the Warehouse Building.
The execution of the enclosed is not to be construed as waiving any right of the Gilbane Building Company otherwise accrued under this contract.
The dollar amendment in the amount of $1,167.00 is to be construed as relating solely to the additional cost of spread footings and does not relate to any other cost arising out of such change in specifications.
Claims for additional costs relating to the changed conditions attendant thereto, will be the subject of further claim.
45. On July 1,1957, plaintiff submitted a claim in writing to the District Public Works Office of the First Naval District of defendant, based upon the circumstances related in plaintiff’s petition. The claim was forwarded to the Contracting Officer who, by letter of January 30, 1958, replied that insofar as plaintiff’s claim was based upon increased costs due to Government-caused delay, it represented a claim for damages and, as such, was not a subject for an equitable adjustment under the contract.
46. A timely appeal, filed February 21, 1958, from the decision of the Contracting Officer was referred to the Armed Services Board of Contract Appeals, Navy Panel, and was entered in the docket as proceedings ASBCA No. 4884.
47. Under date of June 18, 1958, the Armed Services Board of Contract Appeals rendered its decision on defendant’s motion to dismiss plaintiff’s appeal. The body of the Board’s opinion reads as follows:
MOTION TO DISMISS
1. In this timely appeal Appellant’s complaint alleges that through no fault of its own the site for the construction of the transit shed called for by the subject contract was not made available until June 1955, whereas the contract specified it would be available to commence *371 work on 22 November 1954. It is also alleged that when the site became available Appellant’s driving of a part of the piles required to be driven displaced earth filled into the area by another contractor and the Government issued a stop order from 28 June 1955 to 20 July 1955, during which time the Government redesigned these foundations, changing the pile foundations to spread footings.
2. Appellant asserts that the fact that “the subsurface physical conditions at the site on November 22,1954 differed materially from those stated as would be subsurface physical conditions on that date according to the provisions of the contract constituted a changed condition” giving it the right to an equitable adjustment, and also that the Government failed to fulfill its obligation to provide a site suitable for construction in the transit area on 22 November 1954.
3. The Government asserts that Appellant does not make any claim for physical changes as a result of the alleged changed condition, that such costs were incorporated in Change Order “M” agreed to by the parties as the increased cost for the actual physical work involved. The record supports this assertion and we so find. The Government contends that Appellant’s claim is for costs resulting from standby labor and disruption of schedules emanating from the failure of the Government to make the site available as specified and. has moved to dismiss on the ground the matter is not within the Board’s jurisdiction.
4. On the record before us, both parties having waived oral hearing on the motion, the Government’s motion is well taken. In our opinion this appeal presents a claim based on unreasonable delay on the part of the Government in making the site available to Appellant for performance of the work. We cannot find any provision in the subject contract authorizing an equitable adjustment in the event of such delay, and, in the absence of such provision, the Board has no jurisdiction. Brown-Coble Construction Company, ASBCA No. 2362, decided 26 January 1956; Lam Building Corporation, ASBCA No. 3361, decided 2 May 1957,57-1 BCA ¶ 1308. See Julee Comforter Manufacturing Corp., ASBCA No. 4282, decided 30 January 1958, 58-1 BCA ¶ 1617. The appeal also presents a claim based on a stop order issued by the Government for a period of time during which Appellant stood by and waited for the Government to change the specifications. The subject contract contains no suspension of work article nor is there any other *372 article in the contract providing for an adjustment in the contract price because of such delay on the part of the Government. Neither the “Changes” nor “Changed Conditions” articles can be used as a mechanism for such adjustment. Roy C. Ek, ASBCA No. 3096, decided 6 August 1956, 56-2 BCA ¶ 1032. Archie & Allen Spiers, Inc., ASBCA No. 3503, decided 6 August 1956, 56-2 BCA ¶ 1031. Jack Clark, ASBCA No. 3672, decided 13 August 1957, 57-2 BCA ¶ 1402. Hart & Hynding, Inc., ASBCA No. 4824, decided 29 May 1958, 58-1 BCA ¶-.
5. The motion is granted and the appeal dismissed.
48. (a) Among the reasons why plaintiff’s work under the contract was delayed and not completed as provided in the progress schedule (finding 5(c), supra) on December 21, 1955, were the following:
(1) The hurricanes which caused delay in the work on both the warehouse and the work of preparing the transit shed site;
(2) The change order, issued by defendant to Raymond Concrete Pile Company, which extended the contract completion date of Raymond Concrete Pile Company for the installation of the sheet pile bulkhead and the fill in the transit shed area 192 days, to and including June 1, 1955;
(3) The various change orders issued by defendant to plaintiff;
(4) Corrections of work required to be done by plaintiff;
(5) The stop order of June 28, 1955, issued by defendant to plaintiff;
(6) A jurisdictional labor dispute causing “a few days” delay, and
(7) Delays of unspecified duration caused by plaintiff’s subcontractors and materialmen.
(b) The evidence does not establish that the delay in plaintiff’s work under the contract was attributable to any fault or negligence on the part of defendant.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is therefore dismissed.

 A transit shed is a building that is located at the water’s edge upon a wharf and is used for the temporary storage of supplies offloaded from or intended for loading onto vessels moored at the wharf. The particular structure involved in this case was a one-story building with a structural steel frame, side walls of precast concrete slabs and a metal roof. It had a floor area 302.6 x 101.33 feet.

 By a letter dated May 4, 1855, the Assistant to the Resident Officer in Charge of Construction notified plaintiff that the transit shed area “is ready for the start of your ■work.” Plaintiff’s reply, sent two days later, asserted that Raymond was still at work in the area and declined to begin work until Raymond’s work force had left it. On May 17, 1955, the Assistant to the Resident Officer advised plaintiff in writing that, in the opinion of the Government, Raymond’s remaining operations would not interfere with plaintiff, and that plaintiff should consider the area as available. Plaintiff again protested that it could not begin until Raymond was completely finished and its personnel had vacated the site. On May 31, 1955, defendant’s representative advised plaintiff that the entire area had been completed. Plaintiff confirmed this on the following day. The dispute as to the exact date when plaintiff could have begun its work on the transit shed was never resolved by the parties. In view of the result we reach, we do not undertake to do so in this opinion.

 The evidence also shows that plaintiff was itself responsible for delays in constructing the warehouse, a building which was more than five times as large as the transit shed. It had planned to begin work on the warehouse on June 27, 1954, to start the transit shed on November 22, 1954, and to complete both buildings on December 21, 1855, within 540 days which the contract permitted for the entire project. In actuality, however, the transit shed was not completed until July 1956 and the work on the warehouse continued until October of that year, when the Navy accepted both buildings. Despite the delay in starting the transit shed, therefore, its construction took the same length of time (13 months) that plaintiff had foreseen it would. Defendant granted extensions of time to both plaintiff and Raymond sufficient to eliminate any claim for liqiudated damages.