**KEHM CORP. v. UNITED STATES.**

No. 48580.

United States Court of Claims.

Nov. 7, 1950.

George E. Strong, Washington, D. C., John Graydon Harlan, Washington, D. C., on the brief, for plaintiff.

Benton C. Tolley, Jr., Washington, D. C., H. G. Morison, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

On October 8, 1943, the plaintiff contracted with the United States to manufacture for the Navy 2,800 concrete practice bombs, 2,500 to be 100-pound bombs and 300 to be 1,000-pound bombs. Plaintiff had two plants, one at Miami, Florida, where the 1,000-pound bombs were manufactured, and one at nearby Fort Lauderdale, where the 100-pound bombs were

manufactured. The completed bombs were to include tail assemblies which were to be furnished by the defendant. Delivery of the bombs, complete with tail assemblies, was to be made within 45 days, that is, by November 22, 1943. As it turned out, the last shipment was not made until April 12, 1944. Plaintiff has been paid the contract price, and now sues here for an additional $21,737.94 as compensation for losses and damages allegedly sustained as a result of delays caused by the Government which retarded completion of the contract. The period for which damages are sought ended April 7, 1944, and plaintiff's claim was first filed with the contracting officer on April 8, 1944. The case at this stage is limited under our Rule 39(b), 28 U.S.C.A., to a determination of whether the United States is liable for any part of the money sought to be recovered.

The contract did not specify what type of tail assemblies was to be supplied by the Government, nor when. There were two types, service and practice. The methods of manufacturing the bombs differed depending on the type of tail to be used. Practice tails must be cast integrally with the concrete, which means that the bomb cannot be cast until the tail is actually on hand. Service tails are attached after the concrete casting has been completed, and it is feasible therefore to cast the bomb before receipt of the tail. In the initial stage of the negotiations leading up to the contract, it was contemplated that practice tails would be used. Prior to the signing of the contract, however, plaintiff was informed that service tails were desired and would be supplied. The Navy did not have sufficient tail assemblies and had to procure them by special orders. At the time the contract was signed, the Navy had not ordered any service tails for 100-pound bombs, although it had ordered 500 practice tails on September 10. Plaintiff, however, had been led to expect service tails.

On October 16, the Government delivered the 500 practice tails to plaintiff at Fort Lauderdale. Plaintiff had already commenced making molds for bombs to which service tails could be attached. A week was lost while plaintiff attempted to determine whether the delivery of practice tails was a mistake or whether it indicated a change in the last expressed intention of the Navy, which was that service tails would be supplied. Plaintiff was again assured that service tails were wanted and would be furnished for the major part of the bombs. Plaintiff was instructed, however, to proceed with the manufacture of the bombs with the tails at hand, that is, with the practice tails. Plaintiff had previously cast some test sample bombs with practice tails and had about a dozen or two of these molds on hand. Other molds for practice tail bombs were made, and plaintiff had 500 100-pound bombs, equipped with practice tails, ready for delivery by November 22, 1943, the date by which the contract was supposed to have been completed.

Three days earlier, on November 19, two more shipments of tails were received. One shipment, to Fort Lauderdale, was of 500 more practice tails for 100-pound bombs; the other, to Miami, consisted of 500 service tails for 1,000-pound bombs. This was the first shipment of tails for 1,000-pound bombs and was of the expected type. Plaintiff proceeded with the manufacture of 1,000-pound bombs, and the 300 called for in the contract were ready for delivery by the end of December.

No more tails were received by plaintiff until February 23, 1944, when 2,050 service tails for 100-pound bombs were received. These tails had not even been ordered by the Government until November 12, 1943, and an additional shipping order for them had to be issued on January 25, 1944. After receipt of this shipment, manufacture of 100-pound bombs was resumed and all casting was completed at Fort Lauderdale by March 10, 1944. Plaintiff then closed its Fort Lauderdale plant and moved the undelivered 100-pound bombs to Miami. Some of the tails for this last group of bombs were not attached until after the bombs had reached the Miami plant.

Plaintiff was unable to complete manufacture of the bombs by November 22, 1943, because of defendant's delay in furnishing the tails. Furthermore, the delivery of practice tails on October 16 and of practice

*and* service tails on November 19 was confusing; this in itself caused some delay. Plaintiff was frequently assured, however, that service tails had been ordered and could be expected momentarily. Plaintiff's vice-president testified that during the period from November 19, 1943, to February 23, 1944, he expected the service tails "almost on a daily basis." Plaintiff proceeded with the manufacture of the bombs as rapidly as the tails were received, and all were completed within 45 days of receipt of tails for them.

Plaintiff was further delayed by the defendant's failure to accept the bombs as they were completed. The contract called for delivery to the Naval Air Station at Fort Lauderdale. Finding 14 sets out the amounts delivered in the various shipments, where delivered, and when. The first bombs were delivered on November 23, the last not until April 12. Deliveries were made on common carrier trucks; Government bills of lading, readily supplied by defendant, were used. However, deliveries could be made only as rapidly as defendant's Supply Officers would agree to accept the bombs. If deliveries had been made without the prior approval of the Supply Officers at the destination bases, the trucks were likely to have been returned to plaintiff still loaded. By the end of January 1944, 739 100-pound bombs and 96 1,000-pound bombs had been delivered to the Navy. Defendant refused to permit further deliveries until after Amendment No. 1 to the contract came into force, which was on March 21. This Amendment diverted the remaining bombs to the Naval Air Station at Miami. Deliveries were then resumed; the remaining shipments were made as rapidly as they were scheduled by defendant's Supply Officer at Miami.

Behind the defendant's delays in accepting the bombs was the fact that the Navy had lost interest in the concrete bomb program. It was having difficulty in finding storage space for these now unwanted items. Because of the uncertainty created by defendant's confusing deliveries of practice rather than service tails and because of defendant's delays in supplying any tails and in accepting the completed bombs, plaintiff's performance of its contract was delayed until April 12, 1944. For purposes of measuring damages in this case, however, the period of delay will have to be considered as ending on April 7.

Plaintiff has been paid the contract price. Its claim for additional expenses was filed on April 8, 1944. On July 10, 1944, the contracting officer made findings of fact sustaining plaintiff's contentions. His findings were forwarded to the Navy Department, which referred the matter to the Comptroller General, who disallowed the claim on January 26, 1945, on the ground that it was for unliquidated damages and therefore a matter for determination by the courts. The disallowance was reaffirmed on September 7, 1945. We have now to determine not the extent of recoverable damages, if any, sustained by plaintiff but whether any recoverable damages were sustained, that is, whether defendant's delays amounted to a breach of contract.

 Logic would seem to require that a contract binding one party to fabricate goods for another by a certain time out of material to be furnished by the other must perforce be held also to bind the other party to supply the material sufficiently early for the work to be done as promised and not to be dilatory in accepting the completed goods. The law considers a promise such as plaintiff's to be subject to a "constructive condition of cooperation." Patterson, Constructive Conditions in Contracts, 42 Col.L.Rev. 903. The promisor's undertaking normally gives rise to an implied complementary obligation on the part of the promisee: he must not only not hinder his promisor's performance, he must do whatever is necessary to enable him to perform. United States v. Speed, 8 Wall. 77, 75 U.S. 77, 19 L.Ed. 449; George A. Fuller Co. v. United States, 69 F.Supp. 409, 108 Ct.Cl. 70; Worthington Pump & Machinery Corporation v. United States, 66 Ct.Cl. 230; 5 Williston on Contracts (1937) Sections 1293A and 1318. The implied obligation is as binding as if it were spelled out. Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, 118 N.E. 214.

■ The implication is sometimes defeated by circumstances. It was in United States v. Howard P. Foley Co., Inc., 329 U.S. 64, 67 S.Ct. 154, 91 L.Ed. 44; Cf. J. J. Kelly Co. v. United States, 69 F.Supp. 117, 107 Ct.Cl. 594. The Government contends that the Foley decision precludes recovery here. In that case, Foley contracted to install a lighting system at the National Airport within 120 days. He was unable to finish before 277 days because the Government did not have the runways ready in time. The Supreme Court held that the contract neither expressly nor impliedly obligated the Government to make the runways available at any particular time and imposed no liability for the kind of delay that occurred. The Court made it clear that in every case the inquiry must be whether the delays constituted a breach of contract. In the Foley case the Supreme Court held they did not. We hold that in this case they did.

■ The two situations are quite different. In the Foley case it was found as a fact that the Government performed its part "with great, if not unusual, diligence" [329 U.S. 64, 67 S.Ct. 155] and that no fault could be attributed to its representatives. In the present case the Government was far from diligent. Plaintiff was led to anticipate the arrival of service tails, and practice tails were delivered. The bulk of the tails was not even ordered by the Government until November 12, ten days before the contract was supposed to have been completed. Furthermore, Foley and the Government contracted in an atmosphere pregnant with the possibility of delay; both knew that the lighting system could be installed only after the airport site had been dredged up from under water, allowed to settle, and graded. The Government had not expressly obligated itself to pay damages solely because of delays in making the site available; and, under the circumstances, it could not be said to have done so by implication either. Such circumstances are lacking in the present case. Plaintiff here expected to begin immediately; it was ready, willing, and able to do the job within the specified period. The parties contemplated that the tails would be delivered in sufficient time for plaintiff to complete the contract within 45 days. And certainly on October 8, 1943, no consideration at all was given to the possibility that the Navy's Supply Officers might be reluctant to accept the completed bombs. In fact, plaintiff anticipated additional contracts. There was nothing on the face of the contract, nothing implicit in the situation, to suggest to plaintiff that it should have taken into consideration in setting the price the possibility that performance would be delayed by the Government. Plaintiff undertook to manufacture 2,800 concrete bombs, with tails to be furnished by the Government, and deliver them within 45 days. The normal implication arose, and defendant became bound by the contract to supply the tails in sufficient time for plaintiff to meet its obligation and also not to delay delivery of the completed bombs. Government delays call for Government explanation. None was made in this case. Defendant's delay in furnishing the tails and accepting the bombs amounted, therefore, to a breach of the contract. Underground Construction Co. v. Sanitary District of Chicago, 367 Ill. 360, 11 N.E.2d 361, 115 A.L.R. 65. Bombs on which service tails are used can be cast before receipt of the tails since service tails are attached after the concrete casting is completed. However, after the receipt of shipments of practice tails—which, if they are to be used, must be cast integrally with the bombs—plaintiff was understandably reluctant to proceed with the casting of any bombs until it knew which tails would be received for those bombs. If plaintiff was unjustified in not casting any bombs until the tails for them had been received, the Government would still be guilty of a technical breach of contract. Whether or not plaintiff was justified in waiting is a question bearing upon mitigation of damages which must wait for the second phase of this case.

■ Neither the defendant's obligation nor its liability for its breach is diminished by the fact that the contract provided for an extension of the time for performance in the event of Government-imposed delays. Although such a provision, which is

nearly always found in Government contracts, is intended primarily for the benefit of the contractor, it is not without a bearing on what the contract binds the Government to do. H. E. Crook Co., Inc. v. United States, 270 U.S. 4, 6, 46 S.Ct. 184, 70 L.Ed. 438. It may, in conjunction with other facts, indicate, as it was held in the Foley case, that the Government did not obligate itself to provide materials or a site or to complete certain work by a certain time. In such cases it is a reasonable construction of the contract that delays in doing these things were anticipated and fully provided for by the provision for an extension of time. But where the Foley type of circumstances are lacking, if the Government, which is the party that draws the contract, intends to exempt itself from liability to pay damages for delaying the contractor's performance and to limit the contractor's remedy to an extension of time, it is likely to do so expressly. See, for example, Wood v. United States, 258 U.S. 120, 42 S.Ct. 209, 66 L.Ed. 495; Wells Brothers Co. v. United States, 254 U.S. 83, 41 S.Ct. 34, 65 L.Ed. 148; Wheeling Mold & Foundry Co. v. United States, 63 Ct.Cl. 353; Poole Engineering & Machine Co. v. United States, 57 Ct.Cl. 232. It has many times been held that the provision for an extension of time does not exclude the possibility that delay may constitute a breach for which damages may be had. Underground Construction Co. v. Sanitary Dist. of Chicago, 367 Ill. 360, 11 N.E.2d 361, 115 A.L.R. 65, 77; Newport News Shipbuilding & Drydock Co. v. United States, 79 Ct.Cl. 1, 24. We do not understand the Foley case to have decided differently for a case such as this. George A. Fuller Co. v. United States, supra.

The Government's right under the contract to make changes cannot justify its waiting until February to supply material it was obligated to supply in October or November. Anthony P. Miller, Inc. v. United States, 77 F.Supp. 209, 111 Ct.Cl. 252; Langevin v. United States, 100 Ct. Cl. 15; Newport News Shipbuilding & Drydock Co. v. United States, supra; Moran Brothers Co. v. United States, 61 Ct.Cl. 73. The bulk of the tails, we note again, was not even ordered until November 12, ten days before the scheduled completion date for the contract. While defendant did have the right to change the delivery destination of the completed bombs, it had no right to hold up deliveries for many weeks while it decided where it would be least inconvenient to have them, thereby forcing plaintiff to keep the bombs long after they were ready for delivery.

Plaintiff's claim is for damages for breach of contract. It could not, as the Comptroller General's ruling would seem to suggest, be finally settled under Articles 2, 10, or 17 of the contract. Langevin v. United States, supra. Nevertheless, the contracting officer did consider plaintiff's contentions and upheld them.

We hold only that defendant's delays breached the contract, prevented timely performance by plaintiff, and resulted in some damage. Plaintiff is entitled to recover the loss it actually sustained as a result of the delay. United States v. Wyckoff Pipe & Creosoting Co., 271 U.S. 263, 46 S.Ct. 503, 70 L.Ed. 938. What these damages were we do not now determine as we have the case now under Rule 39(b). Consequently, we have referred in a general way only, in Finding 23, to the effect of these delays on plaintiff's cost and to the fact that during the period of delay plaintiff did some work under another contract. The burden of proving its damages is still on plaintiff. The determination of the nature and extent of those damages and whether any of them is more properly attributable to plaintiff itself than to defendant and to what extent they were or should have been mitigated awaits further proceedings in the case.

JONES, Chief Judge, and MADDEN, WHITAKER, and LITTLETON, Judges, concur.