OZARK DAM CONSTRUCTORS, a joint venture composed of Brown & Root, Inc., a corporation, Wunderlich Contracting Company, a corporation, Peter Kiewit Sons Company, a corporation, Winston Bros. Company, a corporation, David G. Gordon, Fred B. Schultz and Chester W. Cunningham, copartners trading as Condon-Cunningham Co., Morrison-Knudsen Company, Inc., a corporation, J. C. Maguire, Constance S. Maguire, Constance Smurthwaite Maguire Trust, Marie F. Monahan Trust, Alice L. Maguire Trust, Nell L. Maguire Trust, Constance Patricia Maguire Trust and Frances D. Maguire Trust, copartners trading as J. C. Maguire & Company, and Chas. H. Tompkins Co., a corporation

v.

The UNITED STATES.

No. 143–54.

United States Court of Claims.

Jan. 11, 1955.

John W. Gaskins, Washington, for plaintiffs. Ben H. Powell, Jr., Austin, Tex., King & King, Washington, D. C., and Powell, Wirtz, Rauhut & McGinnis, Austin, Tex., were on the brief.

Gordon F. Harrison, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

The Government moves to dismiss the plaintiffs' petition on the ground that it fails to state a claim on which relief can be granted. In the consideration of the motion, the allegations of the petition are taken as true, and the following recital of facts is paraphrased from the petition.

Ozark Dam Constructors is a joint venture composed of the other named plaintiffs, who are among the largest construction contractors in the United States. The joint venture was entered into for the purpose of making a contract with the Government, which acted through the Corps of Engineers, Department of the Army, for the construction of a concrete, gravity-type dam and appurtenant works at Bull Shoals Dam Site on the White River in Arkansas. Under the contract, the plaintiffs were to furnish all of the labor and construction equipment, and many of the materials for the construction of the dam. But they were not to furnish the cement. The Government was to furnish that.

Paragraph SC–11 of the specifications, relating to "Government Furnished Material or Equipment" provided that such materials and equipment would be furnished f. o. b. at Cotter, Arkansas. The petition does not tell us how far Cotter was from the dam site. SC–11 required the plaintiffs to unload the materials at Cotter and transport them to the job at their own expense. SC–11, paragraph (c), was as follows:

"(c) *Cement.*

"(1) *General.*—The Government will place an order with the mills for the Portland and natural cements which will be available approximately August 1, 1948. The contractor shall furnish to the mills in writing its requirements and shipping dates for Portland cement and shall furnish to the contracting officer in

writing at the same time its requirements and shipping dates for natural cement. The contractor shall give at least 30 days' written notice in advance of the date it will require the first cement of the respective types or kinds and thereafter on the first of each month shall furnish to the above parties, in writing, the amounts required and the shipping dates for the next 30-day period as to each type of cement. Copies of all orders or notices shall be furnished the contracting officer in triplicate. *The Government will not be liable for any expense or delay caused the contractor by delayed deliveries except as provided under Article 9 of the contract.*" [Italics added.]

Article 9 of the contract was the standard Delays-Damages article which, so far as here pertinent, provided that if the work was delayed for causes beyond the control of the contractor, including strikes, the contract should not be terminated by the Government, and the contracting officer should extend the contractor's time for completion of the contract.

The Government made arrangements to obtain the cement which it was to furnish from cement mills located at Independence, Kansas, and to ship it by the Missouri Pacific Railroad to Cotter, Arkansas. The plaintiffs were to give at least 30 days' notice in advance of their cement needs for each month. On July 9, 1949, they gave notice for 12,000 barrels of Portland cement for September, deliveries to begin about September 15, and 41,000 barrels for October. The cement was not delivered in those months because of a strike of the employees of the Missouri Pacific Railroad. Its non-delivery was the cause of the difficulties which led to this lawsuit.

Almost a year earlier, on November 3, 1948, the railroad employees had voted to authorize a strike because of 282 alleged grievances against the railroad. Negotiations for the adjustment of these grievances were carried on intermittently until June 1949. From June 14 to July 7, the National Mediation Board, acting pursuant to the Railway Labor Act, attempted, without success, to mediate the dispute. The employees called a strike for 2 P. M. on July 11. On that date the President of the United States, also acting under the Railway Labor Act, 45 U.S. C.A. § 151 et seq., appointed an emergency Board to investigate the dispute and make a report about it. The Board conducted hearings from July 14 to July 29 and made its report to the President on August 2. The employees rejected the Board's recommendations and called the strike to begin on September 9. The strike began on that date and transportation over the Missouri Pacific ceased. The strike ended October 24, and the first cement thereafter delivered by the railroad at Cotter arrived on October 31.

The events leading up to the strike were known to the Government. In July representatives of the plaintiffs and the Government discussed the possibility of the strike. The Government, however, took no steps to investigate possible alternative ways of getting cement to the job until September 19. In fact, the cement could have been carried by another railroad from Independence, Kansas, to West Plains, Missouri, from which place it could have been trucked the 68 miles to the job. Also, it could have been carried by truck from Independence to the job site. Ozark brought a trucker to the job site to consider that possibility but the Government's representatives did not make known to the plaintiffs the quantity of cement it would permit to be trucked, nor whether trucking would be allowed to continue for any period after the railroad strike had ended.

The plaintiffs reduced their working force and slowed down their work because of the non-delivery of cement, proceeding only with excavation and trestle erection. By October 14, all work had ceased except pumping, which was done to maintain the job in status quo. Employees left the area and did not return when the railroad strike ended. The non-delivery of the cement delayed the job by 43 days. September and October, two of

the best construction months of the year were lost. The resulting damage to the plaintiffs was $473,352.97.

On September 16, the plaintiffs wrote a letter to the contracting officer requesting him to issue an order under paragraph GC–12 of the specifications suspending the work until delivery of cement was resumed. GC–12 provided that the work could be ordered suspended for the convenience of the Government, and that if it was so suspended for an unreasonable length of time, causing additional expense or loss to the contractor, the contracting officer should make an equitable adjustment in the contract price. The contracting officer refused to issue an order of suspension. The plaintiffs then made the same request of the Secretary of the Army. The Secretary on November 2, which was after the strike had ended, responded that the plaintiffs' request had been transmitted to the Chief of Engineers who would conduct a thorough investigation.

The plaintiffs presented to the contracting officer a claim for the increased costs to which they had been subjected. The contracting officer denied the claim on the grounds (1) that under the contract plaintiffs were entitled only to an extension of time; (2) the strike had not resulted from the fault or negligence of defendant, and (3) that suitable hauling equipment in sufficient quantities to transport bulk cement to the job site was not available during the period of the strike. The plaintiffs under the standard Disputes provision, Article 15 of the contract, appealed to the Secretary of the Army. His authorized representative, the Corps of Engineers Claims and Appeals Board rejected the plaintiffs' appeal solely upon the ground that as a matter of law the plaintiffs were entitled only to an extension of time, which had been granted. The Board's decision was based upon the sentence, hereinbefore quoted from subparagraph (1) of paragraph SC–11 of the specifications, which sentence said:

"The Government will not be liable for any expense or delay caused the contractor by delayed deliveries except as provided under Article 9 of the contract."

The petition alleges that the failure of the contracting officer to employ other means for the delivery of cement during the railroad strike was either negligent, or arbitrary, or both.

The Government, in support of its motion to dismiss relies as did the Corps of Engineers Board of Claims and Appeals upon the provision in the specifications, hereinbefore quoted, that the Government would not be liable for delayed deliveries of cement. It recognizes the decisions of this court such as Kehm Corp. v. United States, 93 F.Supp. 620, 119 Ct.Cl. 454; George A. Fuller Co. v. United States, 69 F.Supp. 409, 108 Ct.Cl. 70; Barling v. United States, 111 F. Supp. 878, 126 Ct.Cl. 34, holding that, in the absence of a contractual disclaimer of liability, the Government is liable for damages when it has not been diligent in making deliveries on time. It points to statements in the opinions in the Fuller and Kehm cases, supra, to the effect that if the Government desires such an immunity from liability it should so provide in the contract. It says that in this contract it has so provided, in plain and unambiguous language.

A contract for immunity from the harmful consequences of one's own negligence always presents a serious question of public policy. That question seems to us to be particularly serious when, as in this case, if the Government got such an immunity, it bought it by requiring bidders on a public contract to increase their bids to cover the contingency of damages caused to them by the negligence of the Government's agents. Why the Government would want to buy and pay for such an immunity is hard to imagine. If it does, by such a provision in the contract, get the coveted privilege, it will win an occasional battle, but lose the war.

We do not say that a provision for nonliability such as was inserted in the instant contract may not be effective with

regard to some kinds or degrees of negligence. We do say that the Government's position that the provision must be taken literally, so that the Government is not liable for the consequences of any conduct whatever of its representatives, is wrong.

We look then at the facts of the instant case. Progress on an enormous project, requiring tens of thousands of barrels of cement, is in jeopardy because of a threatened strike on the railroad which is to carry the cement. At least from the time in July when the strike had been called and was only averted at the last minute by the President's appointment of an Emergency Board, it was apparent that there was a strong possibility of a strike when the statutory waiting period would expire in September. Yet no steps were taken to avoid, by having the cement delivered by other means, the delay and damage to the plaintiffs which would certainly result if the job were closed down by the threatened strike. The possible consequences were so serious, and the action necessary to prevent those consequences was so slight, that the neglect was almost willful. It showed a complete lack of consideration for the interests of the plaintiffs. If the plaintiffs really included in their bid an amount to cover the contingency of such inconsiderate conduct on the part of the Government's representatives, the Government was buying and the public was paying for things that were worth less than nothing.

Our conclusion is that the non-liability provision in the contract, when fairly interpreted in the light of public policy, and of the rational intention of the parties, did not provide for immunity from liability in circumstances such as are recited in the plaintiffs' petition.

We do not discuss the plaintiffs' contention that the provision of the contract for a suspension of work and an equitable adjustment of the contract price to cover increased costs and damages for delays entitled the plaintiffs to such an adjustment. We note that the Corps of Engineers Claims and Appeals Board, in a companion case involving the same strike and the same plaintiffs, operating as another joint venture under a different name, supplying the aggregate for the concrete work, interpreted the suspension provision as the plaintiff would have us interpret it. The Board did not apply that interpretation to the instant contract because of the non-liability provision which it contained and the other contract did not. That interpretation, made by the agency that wrote the contract, and being against the interest of the Government, would seem to be authoritative, and to give the plaintiff another ground for recovery. But we do not decide that question.

The Government's motion is denied.

It is so ordered.

JONES, Chief Judge, and LARAMORE, WHITAKER and LITTLETON, Judges, concur.