Davis, Judge,
delivered the opinion of the court :
This suit unfolds another phase of the construction difficulties encountered in the building of a radio communications base for the United States Navy at North West Cape in Western Australia. That project — and its pier — first came to our attention in Hardeman-Monier-Hutcherson v. United States, 198 Ct. Cl. 472, 458 F. 2d 1364 (1972), an action by the joint venture which undertook to erect the pier. This suit is by a later contractor on the project, Koppers/Clough (a joint venture of the Koppers Company, Inc., an American firm, and J. O. Clough & Son, Pty., Ltd., an Australian entity), which agreed with the Navy to build the high frequency communications and support facilities, family housing and related structures, together with necessary utilities and roads, all for a fixed sum of over $20,000,000.
The case comes here on review (by way of cross-motions for summary judgment) of the Armed Services Board of Contract Appeals, ASBCA Nos. 12485, 13119, 71-2 BCA *348 ¶8920, which held the contractor not entitled to recover costs due to delayed access to the pier needed for unloading supplies for the construction project.[1] Plaintiff seeks Wunderlich Act review, 41 U.S.C. §§ 321, 322 (1970), and also asks, if necessary, for relief on a claim of breach of contract.
Since the construction site was in a remote area of Australia, 250 miles from the nearest paved road, the Navy concluded that the most economical method for transporting construction materials and other supplies (e.g. oil) to the site would be by sea. As the board found (71-2 BCA ¶8920 at 41,444), the hope was that, by building a pier near the site and allowing its use by second-stage contractors (such as plaintiff), the over-all costs of construction would be reduced. The pier contract was awarded to Hardeman-Monier-Hutcherson in July 1963 for completion within one year, i.e. July 1964, in order to insure these anticipated savings on the second-stage bids. Despite the deadline, the pier was not completed by the time of the invitation for quotations for the later facilities contract in November 1964, nor by the bid-opening in February 1965.[2] Koppers/Clough was awarded this facilities contract in March 1965. The terms called for work to begin May 1965 and to be completed, and the contractor demobilized, by December 1966. Construction was not actually finished until October 1967. Plaintiff blames most, if not all, of the delay on its failure to obtain timely use of the pier, which was not completed and made available to it until February 1967, and even then on a restricted basis for five more months. According to Koppers/Clough, this deprivation significantly increased its costs; it says that, in the absence of the pier, it was forced to adopt much more expensive and time-consuming means of bringing the supplies to the North West Cape.
To reimburse it for this cost-increase, the contractor sought an equitable adjustment under the government-furnished property and changes clauses. The board con *349 sidered tbe pier to be goyernment-fumisbed property but ruled that neither of these articles permitted relief “under the contract” in this situation. Plaintiff rejects that position, but adds that, if the board is right, there remains a valid breach claim, redressable in court, for the Government’s failure to make the pier available in proper time.
The specifications contained two explicit references to the pier.[3] The first stated that “[w]hen completed, the pier structure may be used by the contractor on a scheduled basis * * * for the unloading of camp supplies and construction material. The contractor will be allowed nonexclusive use of the pier * * * for the life of this contract.” In the other reference, access dates for various projects being built 'by other contractors were detailed. Under the pier section of this schedule, it was stated that “[u]pon completion that the contractor may use the pier * * *.” Moreover, the contract contained a government-furnished property clause [GFP clause] saying that “[t]he time for completion of the work under this contract is based upon the expectation that the Government-furnished property, if any, as set forth in the specification will be delivered to the Contractor at the times stated or, if not so stated, in sufficient time to enable *350 the Contractor to perform within the time for completion of the contract work.” However, if the property were not delivered on time, and in the absence 'of a suspension-of-work clause — there was none in this contract — “the Government shall only be liable to make an equitable adjustment * * * for changes in the property furnished.” [4]
These three clauses were the contractual basis for Koppers’ assumption that it would have access to the pier for most of its shipping needs — an assumption not contradicted by its own estimate at bidding time of a reasonable completion date for the pier.[5]
For the reasons which follow, we hold that the board was right in refusing relief “under the contract”, but that plaintiff has a breach claim, triable in this court, for any damage due to the Government’s own fault or responsibility for postponement of the pier’s completion.
I
For both administrative relief and recovery in breach, a double-barreled question comes first: did the defendant warrant or represent or affirm that the pier would be made available at any time before it happened to be completed (whenever that might be, and irrespective of fault), and *351 was the pier government-fumislied property ?[6] Those are the twin issues we consider in this section of the opinion. The corollary problem of whether the defendant’s obligation was a full warranty or the lesser duty to refrain from conduct causing or enlarging the delay is discussed in Part III infra.
Although we shall separately scan the portions of the contract bearing on Koppers/Clough’s use of the pier, our overriding premise will be that, in adjudging whether the defendant had any obligation at all prior to actual completion, these three clauses cannot be read in isolation but must be understood as mutually related in the context of the whole contract and its background.
Taken alone, the first provision — the statement in “B-1.5 Pier”, supra note 3, (“When completed, the pier structure may be used by the contractor * * *”) — is similar to and no stronger than the contractual language found not a warranty in Chris Berg, Inc. v. United States, 182 Ct. Cl. 23, 389 F. 2d 401 (1968). In that case, a government-owned tramway was in existence at the time of contract and available for use by the contractor in building a new tramway. The contract specified that “[t]he existing towers and tramway may be used in erecting the new towers and tramway.” With only that representation present, the court held that the phrase “may be used”, in the absence of a GFP clause, “refers merely to permissive use and not to any specific suitable or intended use.” 182 Ct. Cl. at 28, 389 F. 2d at 405.[7] By analogy, the language of this part of B-1.5 alone would provide only for permissive use of the pier and even then only after “completion” (whenever that might physically be).
There is, however, in B-1.5 some stronger language (“The contractor will be allowed nonexclusive use of the pier for operations related to and for the life of this contract” (emphasis added)) which could reasonably suggest that the pier would probably be accessible for at least a good part of plaintiff’s performance time.
*352 Tbe second specification clause, B-12.1 (“Tbe pier structure is now being completed * * *. Upon completion tbe contractor -may use tbe pier * * * as hereinbefore stated”), supra note 3, adds a measure of further strength to tbe first, introducing tbe inference of completion in tbe foreseeable future. In Gilbane Bldg. Co. v. United States, 166 Ct. Cl. 347, 333 F. 2d 867 (1964), a similar yet more definite specification stated that “[t]he installation of * * * bulkhead and the fill * * * is being accomplished under another contract and will be completed and tbe site [made] available * * * on November 22 * * Despite this explicit assertion, the contract language was found not to be a warranty. Tbe court thought that tbe defendant did represent that tbe site would be available at a specific time, but there was no guarantee that it would be; there was no accompanying assertion that, if tbe site failed to be made available on that date, the contractor would be eligible for some form of recompense. Further, the type of work involved in the first-stage contract was peculiarly susceptible to delay and the court felt that both parties must have recognized it. The specifications hinted, by a built-in presumption that “excessive” delay was the fault of the Government, that some “non-excessive” delay was to be expected.[8] But with respect to Gilba/ne it is very important to note that the court specifically found that none of the delay was attributable “to any fault or negligence on defendant’s part”, and it construed the issue before it to be “whether defendant is liable for [the other contractor’s] delay even though it did not wrongfully cause it.” 166 Ct. Cl. at 350, 333 F. 2d at 868-869.
For these reasons, we would conclude, if these two clauses (B-1.5 and B-12.1) were the only relevant contract provisions, that they failed to incorporate a warranty-without-fault, but might well make the Government liable for delay *353 (in supplying the pier) due to its own wrong or unacceptable stimulus.
We come next to the government-furnished-property article (note 4, supra). That clause does not itself list the items within its reach; it refers to “the Government-furnished property, if any * * *.” The Government thinks that government-furnished property must be designated as such in the specifications, and argues that the pier is not so identified in specification A-18 (“Government work and materials”). We doubt that there is a rigid requirement for characterization eo nomine, but if so it is fulfilled here. Specification A-18.2 states that “the Government will also supply water for certain uses and will make available certain facilities * * * for use by the contractor as set forth in part B,‘Special Conditions’,” thereby incorporating the references to the pier in B-1.5 and B-12.1, supra.
The Government also urges that the pier is disqualified from treatment as government-furnished property because (1) it could not be supplied until completed, i.e. it did not exist as government property until completed by Hardeman-Monier-Hutcherson, and (2) exclusive use of the pier was never granted to Hoppers/Clough. The first point addresses only the problem (discussed below) of whether “upon completion” is literally the time specified for the Government to open the pier. How the property comes into existence is not of concern to the contractor; if the Government makes a representation that it will furnish something, it will be bound even if it does not possess the property at the time of the representation.[9] As for exclusive use, we do not think that that type of use is necessarily required for government-furnished items. If there is a failure here on the part of the Government, it is that it promised reasonable access to the pier and then did not furnish the pier at all, whether for exclusive or nonexclusive use.[10]
*354 Thus, we agree with the board that the GFP clause, in coordination with the other provisions, covers the pier. But that is only a threshold determination leading to the more critical inquiry whether, on that postulate, the Government has any unsatisfied obligation to the plaintiff.
In S.S. Mullen, Inc. v. United States, 182 Ct. Cl. 1, 389 F. 2d 390 (1968), the court decided that the juxtaposition of permissive specifications and GFP clause yielded a warranty, in that instance one of suitability of intended use. The GFP clause in Mullen contained the assertion:
The * * * completion dates * * * are based upon the expectation that Government-furnished Property suitable for use will be delivered * * * at the times stated in the Schedule or, if not so stated, in sufficient time to enable the Contractor to meet such * * * completion dates.
This is very close to the wording in the present contract. However, the Mullen clause continued:
In the event that Government-furnished Property is not delivered to the Contractor by such time * * * [or if] the Government-furnished Property is received by the Contractor in a condition not suitable for the intended use * * * the Contracting Officer * * * shall equitably adjust the delivery, performance, or completion dates or the contract price, or both * * *.[11]
Properly agreeing with plaintiff that there was “no difference in principle between the warranty of suitability for use [as in Mullen] and the warranty of timely delivery”, the board nevertheless foreclosed Koppers/Clough from relief under the contract because, in this case, the GFP clause limited the administrative remedy, in the absence of a suspension-of-work provision, to an adjustment under the changes article “for changes in the property furnished” (supra note 4) —and the board correctly ruled that there were no such changes here. 71-2 BCA ¶ 8920 at 41,446-47.
We concur that the very explicit statement at the end of this GFP clause bars administrative relief under that article; it is beyond our judicial competence to make the limitation *355 disappear. But there can still remain a substantive governmental obligation — not remediable “under the contract”— implicit in the combination of that article with the other pier provisions. The contract told Koppers/Clough that, when the pier was completed, the contractor could use it for the life of the contract; that the pier was then being completed by another contractor; and, in effect, that the Koppers/Clough performance time was based “upon the expectation” that the pier would be delivered “at the time stated” or “in sufficient time to enable the Contractor to perform within the time for completion of the contract work.” The construction site was at a very remote area and both the Navy and plaintiff understood that the pier would be exceedingly useful in limiting transportation costs and burden. The contract was let on that basis.[12]
We think that, in this situation, the preferable interpretation is that the defendant undertook an obligation— although not a full warranty-without-fault — larger than the scope of the very limited administrative relief allowable under the agreement. Obviously, a contractor, as is claimed here, could suffer greater injury (through improper delay in furnishing the item) than merely via changes in the item itself. For one thing, there could be the additional costs of the delay per se; aside from that, to use the present case as an example, there could be the increased costs of bringing the supplies to the Cape by substitute means and without use of the pier. We see nothing to suggest that claims of this kind — probably the more important of the potential injuries to the contractor — were to be eliminated wholesale, so that there could be no remedy at all either through the administrative mechanism or in the courts.
*356 There can, of course, be a contractually binding representation of proper delivery of government-furnished property without any administrative relief under the contract if the representation is left unfulfilled. This, in our view, is partially the case here. This GFP clause does not stipulate that the administrative provisions for adjustment are exclusive or that the Government shall not 'be liable for suit for breach of contract, as was true in /S./S. Mullen Inc. v. United States, supra, see note 11 supra. The language at the end of the provision limits only the Government’s liability “to make an equitable adjustment”, nothing more. It is not the sweeping exculpation present in other cases. See, e.g., Ozark Dam Constructors v. United States, 130 Ct. Cl. 354, 359-60, 127 F. Supp. 187, 190-91 (1955). Although the parties may have provided merely a restricted, not a comprehensive, remedy “under the contract”, the Government’s substantive obligation remains intact and can be enforced by the courts.[13] Useful analogies are the rules that a contract provision for a time-extension need not automatically bar a damage suit for the same wrongful delay (Kehm Corp. v. United States, 119 Ct. Cl. 454, 93 F. Supp. 620 (1950)), or that an equitable adjustment under the changes or changed conditions articles does not foreclose a suit to recover for unreasonable delay in responding to the same changed conditions or making the change (see Jefferson Constr. Co. v. United States, 183 Ct. Cl. 720, 727, 392 F. 2d 1006, 1011, cert. denied, 893 U.S. 842 (1968)).
The precedents involving GFP clauses do not exclude this interpretation of the defendant’s substantive obligation. In Mullen, supra, the court did rely heavily on the administrative provision for an over-all equitable adjustment, 182 Ct. Cl. at 8-9, 389 F. 2d at 393, but that was a case in which a full warranty-without-fault was .found, rather than, as we rule here, an obligation to refrain from contributing to the delay (see Part III infra). Also, the Mullen opinion was far *357 from suggesting that a combination of administrative and judicial remedies -was less effective, for the purpose of implying a substantive obligation with respect to government-furnished property, than an exclusive administrative mechanism.[14]
In United States v. Croft-Mullins Elec. Co., 333 F. 2d 772 (C.A. 5, 1964), cert denied, 379 U.S. 968 (1965), the contract contained a GPP clause with the standard expectation of timely delivery but, outside of this one statement, failed to specify any particular time for the Government to supply the required materials. 333 F. 2d at 775. The GFP provision also contained an explicit disavowal of guarantee of any particular time for delivery; also present was an exculpatory clause denying damages for delivery delay. The failure to set explicit outer bounds for delivery was not the basis for denial of relief. The Fifth Circuit relied instead on the disavowal of any guarantee.[15] Here, of course, there is no such disavowal and its absence makes our case quite different.
There Still remains the precise question whether, assuming the defendant had some substantive obligation, that duty was any greater than merely to allow access to the pier once it was finished. Plaintiff urges that the contract set a specific date by which the pier would be available — the first day of the contract or whatever later date would still permit “timely and economical” completion of the work. The Government naturally answers that the time was stated in B-1.5 and B-12.1 to be “upon completion” and that the only duty was to furnish it at that time.
The defendant’s reading, if taken as excluding delay for which the Government was responsible, would eviscerate the obligation. So long as the Government turned over (or were willing to turn over) the pier to Koppers upon its comple *358 tion, tlie obligation would be met, ©yen if tbe time of completion were long after tbe conclusion of tbe contract and the delays were all attributable to tbe defendant. We think, however, that tbe GFP and other clauses must be understood as at least .promising that tbe Government will not itself prevent tbe pier from becoming available “in sufficient time” to enable tbe plaintiff to do its work by tbe performance date. Tbe contractor should not have to include in its bid a contingency hedge against tbe Government’s own fault or failure to do what it should.
Such a time limit is reinforced by tbe contractual statement that tbe pier “is now being completed”, words with a ring of imminence to them, as well as by the intimation that tbe contractor would have access to tbe pier, upon completion, “for tbe life of this contract.” Plaintiff knew that the pier bad been under construction for approximately eighteen months at tbe time of the second stage bidding and that the Koppers contract was to run until December 1966, another 22 or 23 months. It would be most reasonable to conclude that, at tbe least, defendant was promising that it bad not and would not delay completion of tbe pier by its own conduct or acts. This is not a forced straining of tbe contract language. If “upon completion” '(modified by “now being completed”) is considered to be sufficient time before tbe end of tbe Koppers contract — at least where tbe defendant is responsible or at fault — then the document’s time references are all brought into a sort of harmony. It is a more acceptable rendering of tbe contract than that suggested by tbe Government. Cf. Thompson Ramo Wooldridge Inc. v. United States, 175 Ct. Cl. 527, 537, 538-39, 361 F. 2d 222, 229, 230 (1966).
Tbe defendant argues that tbe time sequence of delayed completion of tbe pier and tbe awarding of tbe Koppers/ Clough contract should preclude a finding of any obligation. Tbe point made is that tbe Hardeman-Monier-Hutcherson contract called for 'completion before tbe bidding on tbe second-stage facilities began but, while tbe Government bad originally intended to induce savings on the second-stage contract, tbe pier was so clearly and openly behind schedule at tbe time of tbe second-stage bidding that tbe Government *359 could not have undertaken any responsibility as to its timely completion.
This argument ignores tbe fact that the contract still made the three crucial representations involving the pier. Since the Government knew that the project was a year behind schedule and still uncompleted, it could have refrained from making these affirmations; it could have included a disclaimer like that in United States v. Croft-Mullins Elec. Co., supra. The mere existence of past delay does not automatically yield a presumption of future delay, or deny that the past lag will be made up by acceleration in the future. Nor would the openness of the existing delay negate a representation that the Government had not been and would not in the future be at fault. Moreover — and very significantly — the board has admissibly found (note 12 supra) that the plaintiff was reasonable in concluding that the pier would be usable by August 1965 (aside from future slippage not due to the Government). That factual determination is adequately supported by the record in this case and in Hardeman-Monier-Hutcherson.
We conclude, therefore, that the United States had a greater obligation than merely to grant access to the pier once it was finished. 'In Part III, infra, we give in greater detail our reasons for holding that this obligation is limited, in the present case, to damages resulting from the Government’s fault and responsibility for the delay, -and that the claim is for breach of contract justiciable in this court.
II
We have held, in Part I supra, that the board was right in ruling that plaintiff could not obtain administrative relief under the GFP clause. But the absence of a remedy under that provision does not mechanically foreclose all relief under the changes article, and plaintiff also invokes the latter as an alternative basis for an equitable adjustment under the contract.
Under the changes clause any alteration in 'the work to be performed or in the method of performance can result in adjustment if it causes an “increase * * * in the Contrae *360 tor’s cost of, or time required for, performance of the contract * * Even if the Board was correct in limiting the phrase “work to be performed” to the physical structures, plaintiff insists that the method of performance was altered by the unavailability of the pier. In light of this forced change in method, the contention rims, it would be incorrect to limit the scope of relief under the changes article by the two-step process of declaring the pier to be a government-furnished item and then superimposing the restrictions of the GFP clause upon the changes provision.
The contractor’s thesis requires the assumption that a specific method was chosen for carrying out the work and that that method was changed by the delay in access to the pier.[16] But even if a method were clearly chosen and then changed, we think that the limitation of the GFP clause still prevents independent adjustment as a change. In any construction project, if government-furnished property is delayed, then the part of the project dependent upon such property will either be delayed or carried out in some alternative manner. Change in method would stem from the initial delay of delivery of the item. In the present contract, administrative relief for the initial delay has been limited by the GFP clause to changes in the property furnished. This does curtail the normal breadth of the changes clause. If there were no GFP provision in the contract, then it might be possible to agree that there was a change in method for which equitable adjustment is available. However, there is such an article and it contains a very clear and specific limitation on the possibility of administrative relief for delay in delivery. If there are changes or deficiencies in what is furnished, if it is unsuitable for its intended use, then there is administrative relief. But if the pier furnished is as represented but only later in delivery then there is to be no contractual remedy even if there are changes in manner of *361 performance as a result of the delay. It would squarely contradict this specific restriction at the close of the GFP clause to allow the changes clause to supply a substitute administrative remedy.
We agree therefore with the board that (1) the pier was government-furnished property, (2) there was no relief under the GFP clause, and (3) the GFP clause effectively limited the scope of equitable adjustment otherwise available under the changes clause. The plaintiff has not persuaded us of any error in this interpretation limiting the “normal” breadth of the changes clause. At least as long as some nonadministrative remedial courses remain open, it is not necessary to read a changes clause as always having its “normal” breadth, regardless of specific companion provisions in the contract. As we have suggested, this result does not foreclose the existence of an obligation relating to proper delivery of the pier, redressable in a breach suit. It is only the possibility of an administrative remedy which has been removed. Cf. Aerodex, Inc. v. United States, 189 Ct. Cl. 344, 357-58, 417 F. 2d 1361, 1368 (1969).
Ill
'Since the Government has undertaken a substantive obligation extending ibeyond the narrow administrative remedy prescribed in the agreement, the contractor, we have already indicated, has a breach claim triable 'in this court.[17] Plaintiff would have it that this claim is for breach of warranty, regardless of the Government’s fault. See Dale Constr. Co. v. United States, 168 Ct. Cl. 692, 699 (1964); Paccon, Inc. v. United States, 185 Ct. Cl. 24, 31-32, 399 F. 2d 162, 166-67 (1968). In our view, however, the defendant’s obligation, so far as vindicable in a breach suit, was that it not contribute to the delay through its own fault or responsibility.
We take this position because of two intertwined factors, both of which are essential to our conclusion. The first is that the particular contract language is too soft to call for a *362 judicially enforceable warranty-witliout-fault. The second is that, in comparable circumstances of ¡bifurcated administrative and judicial remedies, we have insisted that in the breach action the contractor prove some -Government fault or unacceptable conduct.
Where another contractor is involved, as here, this court has refused to find an absolute warranty- — guaranteeing the second contractor against delay by the first — in ambiguous, inconclusive, or general discussions or contract provisions. Paccon, Inc. v. United States, supra, 185 Ct. Cl. at 33-34, 399 F. 2d at 167-68. Since it “would be a most unusual undertaking for the Government to shoulder” full responsibility for the other contractor, w© have looked, absent some “express covenant”, to see if “the Government is at -fault in some way.” Id. See also Ben C. Gerwich, Inc. v. United States, 152 Ct. Cl. 69, 76-77, 285 F. 2d 432, 436 (1961); Gilbane Building Co. v. United States, 166 Ct. Cl. 347, 333 F. 2d 867 (1964). That principle is directly applicable to this contract. Although we have found that the Government’s obligation was not meaningless, the relevant contractual provisions -are not specific enough for -an unqualified warranty-without-fault. In the -absence of more explicit language, the mere designation of the pier as government-furnished property is outweighed by the cardinal element -that this property was then being -built by someone else, over whom the Government had far less than full control.[18]
The other line-of-decisions influencing us is the series sustaining (especially under the older contract forms) the right of a contractor to sue for unreasonable delay, or other un-reimbursed damages — due to -the making of changes, remedying of changed conditions, or the supplying of materials— even though the claimant had obtained the maximum equitable adjustment or time extension allowable under the contract. See, e.g., Jefferson Constr. Co. v. United States, 18-3 Ct. Cl. 720, 392 F. 2d 1006, cert. denied, 393 U.S. 842 (1968); Commerce Int'l Co. v. United States, 167 Ct. Cl. 529, 338 *363 F. 2d 81 (1964); Peter Kiewit Sons’ Co. v. United States, 138 Ct. Cl. 668, 674-75, 151 F. Supp. 726, 731 (1957); F. H. McGraw & Co. v. United States, 131 Ct. Cl. 501, 506-07, 130 F. Supp. 394, 397 (1955); Kehm Corp. v. United States, 119 Ct. Cl. 454, 93 F. Supp. 620 (1950). The administrative remedy authorizes relief narrower than the full scope of the claimant’s injury, and the court has sustained breach actions for the uncompensated portion of the detriment. But, as these cases show, the predicate for recovery has always been that the Government has been at fault or is responsible. Mere proof of delay or of loss has not been enough. See R. Nash & J. Cibinic, Federal Procurement Law 631-34 (2d ed. 1969).
These interrelated principles persuade that in this breach action the plaintiff should be held to proof of some fault or responsibility on the part of the Government. The defendant cannot well complain at being required to meet “the ever-present obligation of any contracting party to carry out its bargain reasonably and in good faith” (Commeree Int’l Co. v. United States, supra, 167 Ct. Cl. at 536, 338 F. 2d at 85), or in being saddled, in this two-contractor situation, with responsibility for delay it caused itself and over which it had control. Cf. L. L. Hall Constr. Co. v. United States, 177 Ct. Cl. 870, 878, 379 F. 2d 559, 563 (1966).
IV
Koppers/Clough maintains that there is no need for additional proceedings to determine that the defendant is liable — the contention is that this is already shown conclusively by the administrative record, together with selected board findings. We do not agree. True, the court has already held, in Hardeman-Monier-Hutcherson v. United States, 198 Ct. Cl. 472, 458 F. 2d 1364 (1972), that the Government was at fault in failing to disclose certain reports to the pier contractor,[19] but the court has not as yet determined to what extent that deficiency delayed the completion of the pier. In the trial which must be had in the present case, that *364 question will have to be considered, as well as any other governmental action (negligent or intentional), leading to a delay in making the pier available to plaintiff, which the plaintiff may establish.
In that connection, the administrative record and findings should have a significant role. Even though the claim is for a breach and is triable in court, we repeat the admonition in Air-A-Plane Corp. v. United States, supra, 187 Ct. Cl. at 281, 408 F. 2d at 1036, to make use, as much as possible, of the relevant portions of the board record in this and the Hardeman-Monier-Hutcherson cases, in order to avoid needless duplication and delay.
The board below found that the defendant was responsible for no more than 60 days of the delay in performance of plaintiff’s work. 71-2 BCA ¶8920 at 41,444, 41,447. Both sides attack this determination, the plaintiff on the ground that the government-caused delay was much more, the defendant denying any responsibility at all on the part of the Navy. Without considering the effect of S & E Contractors, Inc. v. United States, 406 U.S. 1 (1972), on this determination, we hold that the finding is supported by substantial evidence on the whole record (including the incorporated administrative record and findings in E-M-E) as to at least 60 days of delay, and must now be accepted as final since it was made in the course of the board’s authorized function of granting a time-extension to obviate liquidated damages. Air-A-Plane Corp. v. United States, supra, 187 Ct. Cl. at 281-82, 408 F. 2d at 1036-37; Hardeman-Monier-Hutcherson v. United States, supra, 198 Ct. Cl. at 487, 458 F. 2d at 1371 (1972).[20]
With respect to the implicit determination that 60 days was the maximum delay (plaintiff seems to have 'claimed a total of 258 days before the board), we take a different position. The main finding on that matter is cryptic, summary, *365 and conjectural, seeming to rely more on an appraisal of the contractor’s concurrent delays than on a strict evaluation of the delay traceable to the defendant — 'and, 'as we point out in note 20, supra, the plaintiff’s concurrent delays were outside the board’s 'ambit in passing upon the request for a time-extension. Such a defective finding does not merit finality. Cf. Loral Electronics Corp. v. United States, 181 Ct. Cl. 822, 832, 387 F. 2d 975, 980 (1967). The trial commissioner will therefore not be bound by the administrative suggestion that the delay attributable to the Government is necessarily confined to two months.[21]
On the other hand, we also reject the proposal that we should now hold that the existing administrative record compels the trier-of-fact to find that the Navy-rooted delay is as long as plaintiff says. The parts of that record cited to us do not seem conclusive enough for us to make such a declaration at this stage, and we leave the issue Wholly open, to be decided upon the entire record made in the further proceedings.
We suggest, too, that, unless the trial judge feels that there are good reasons for taking up liability and damages in separate trials, with separate proposals to us from the trial division, the trier could well go into damages as well as the full extent of liability in a single proceeding, followed by a single recommendation. Damages and the full scope of liability may be interrelated, and in any event further delay will probably be avoided by having one trial rather than successive ones. Air-A-Plane Corp. v. United States, supra, 187 Ct. Cl. at 283, 408 F. 2d at 1037-38.
The result is that plaintiff has stated a claim for breach of contract and has already shown that 60 days of its delay were attributable to the defendant, but that there must be further proceedings in the court’s trial division to decide *366 whether any further delay is assignable to the Government and also what damages, if ’any, plaintiff incurred.
On these grounds, we deny plaintiff’s motion for partial summary judgment and grant the defendant’s cross-motion for summary judgment with respect to relief under the contract, but grant plaintiff’s motion and deny defendant’s cross-motion on the alternative claim for breach of contract, to the extent indicated in this opinion. The case is remanded to the trial division, under both this opinion and Rule 131(c), for a trial (or other appropriate proceedings to find the facts) on the issues of the extent of defendant’s liability and of plaintiff’s damages (if any).

 The ASBCA did award a time extension and concomitant relinquishment of liquidated damages for the delay. Defendant wants to overturn that determination. See Part IV, infra.

 As of that date, the material for the pier had been fabricated, was at the site, and the pier’s approach extended for 700 of the planned 1100 feet from shore.

 “B-1.5 Pier. When completed, the pier structure may be used by the contractor on a scheduled basis and he will be given permission to use the pier for the unloading of camp supplies and construction material. The contractor will be allowed nonexclusive use of the pier for operations related to and for the life of this contract. No other service beyond permission to use the facility will be furnished by the Government. The contractor shall be liable for any and all damages to the pier (fair wear and tear excepted) occasioned by his use thereof. Operational use of the pier, and the coordination thereof, will be under the exclusive control of the Government. * * *
* * * » *
“B-12.1 Availability of work being performed by others. The various items of work listed below are being performed by others. Access to these items will be available for the performance of necessary work as set forth in this contract, such as interconnections, further improvements, utility installations, and other specified uses on or about the dates given below:
Beads (usable, including temporary roads and detours, for transportation and access use by the contractor) — Prom date of contract.
Streets, Grading, and Drainage, Area B — Prom date of contract.
*****
Pier — The pier structure is now being completed under another Government contract, upon completion the contractor may use the pier on a scheduled basis and he will be given permission to use the pier for the unloading of camp supplies and construction materials and equipment as hereinbefore stated.”

 “35. Government-Furnished Property
“(a) Title to all material and equipment furnished by the Government to the Contractor without charge hereunder and not incorporated into the work hereunder shall remain in the Government.
“(b) The time for completion of the work under this contract is based upon the expectation that the Government-furnished property, if any, as set forth in the specification will be delivered to the Contractor at the times stated or, if not so stated, in suflicient time to enable the Contractor to perform within the time for completion of the contract work. In the event that the Government-furnished property is not delivered to the Contractor by such time or times, the provisions of the specification entitled ‘Price Adjustment for Suspension, Delay, or Interruption of the Work’ shall apply. If there is no such specification provision, the Government shall only be liable to make an equitable adjustment under Clause 3 [the Changes clause] for changes in the property furnished.”

 Plaintiff estimated that the pier could be expected to be completed by August 1365. The Navy estimated (in February 1965) completion as early as the following December. In March, this estimate was advanced to October 1965. The Navy officer in charge of construction speculated to the plaintiff in March that the pier could be finished in 5 to 7 months. There was nothing binding about these speculations, but the board found plaintiff’s expectation to be reasonable. See note 12 infra.

 The Government concedes that It had to be opened to plaintiff upon full completion.

 In S. S. Mullen, Inc. v. United States, infra, 182 Ct. Cl. 1, 389 F. 2d 390 (1968), it was the inclusion of a GPP clause that resulted in an express warranty of suitability for intended use.

 166 Ct. Cl. at 351, 352, 333 F. 2d at 869, 870. The work Involved In tbe first stage was tbe dredging and filling of land in tbe Atlantic Ocean. While there was some site and work similarity to tbe instant case, tbe contractor in Gilbane was working in an area frequented by heavy weather. The delay of access resulted from two hurricanes suffered by the first-stage contractor and their resultant havoc. See Fort Sill Associates v. United States, 183 Ct. Cl. 301, 307-08 (1968) (hinting at a general requirement of awareness by contractors of some delay possibilities).

 Cf. Chalender v. United States, 127 Ct. Cl. 557, 563-64, 119 F. Supp. 186, 190 (1954).

 Exclusivity of use might be relevant to the restricted use of the pier during the period February — June 1967. To the extent that there was no promise of exclusive use, the restricted accessibility offered the plaintiff at that time might not be a ground for recovery If the restriction took the form of allowing others to use the pier together with plaintiff.

 182 Ct. Cl. at 19, 389 F. 2d at 399. Only equitable adjustment was available in Mullen since tbe next sentence in the GFP clause expressly barred breach suits against the Government.

 The board properly found (71-2 BCA ¶8920 at 41,444-45) :
“It is unquestioned tbat tbe Government expected tbe pier to be completed at some time so tbat tbis [plaintiff], could get some reasonable use of it. It expected tbe pier to facilitate construction, and tbat it -would produce a lower bid than would bave been received without tbe pier. [Plaintiff]., did bid with tbe pier in mind, -although it placed no specific dollar value on its use. It did investigate tbe stage of completion, by observation and inquiry, during the bidding period and at the commencement of construction. It concluded tbat tbe pier would be usable by August 1965, and made plans accordingly. We believe this expectation to bave been reasonable; subject, however, to some slippage if H-M-H encountered delaying factors beyond tbe control or fault of itself or tbe Government.”

 Without a clear exculpatory clause, the Government does not shield Itself from suit. See Kehm Corp. v. United States, 119 Ct. Cl. 454, 471, 93 F. Supp. 620, 625 (1950) ; George A. Fuller Co. v. United States, 108 Ct. Cl. 70, 96, 69 F. Supp. 409, 412 (1947). Even a complete and express exculpatory clause may not Immunize. See Ozark Dam Constructors v. United States, supra, 130 Ct. Cl. 354, 359-60, 127 F. Supp. 187, 190-91 (1955).

 In general, the administrative remedy Is a substitute for a breach action. See Chaney & James Constr. Co. v. Unites, States, 190 Ct. Cl. 699, 707, 421 F. 2d 728, 732 (1970) (suspension-of-work clause), under the Mullen contract, it was to he a full replacement for a court action. See note 11 supra. The existence of judicial relief was eliminated, the gap being filled by the administrative device.

 333 F. 2d at 778-79 & n. 13. See the concurring opinion of Judge Brown, stressing that a promise was made to deliver at some time but that the exculpatory clause prohibited any damages for failure to deliver. 333 F. 2d at 781; cf. Whittaker Corp. v. United States, 195 Ct. Cl. 161, 175, 443 F. 2d 1373, 1380-81 (1971).

 The method although obvious may be held unspecified even by Implication. Cf. Lenry, Inc. v. United States, 156 Ct. Cl. 46, 52-53, 297 F. 2d 550, 553 (1962). At the same time, if the Government deletes one oí the specified methods or if the Government specifies a method where it had not done so previously, then changes have occurred. See Note, Equitable Adjustment of Government Contracts, 42 N.Y.U.L. Rev. 302, 309 & n. 39 (1967) ; cf. Nash & Cibinic, The Changes Clause in Federal Construction Contracts, 35 Geo. Wash. L. Rev. 908, 913 & nn. 22-24 (1967).

 The plaintiff is, of course, not estopped by baying sought unsuccessfully to recover all its damages through an equitable adjustment under the GFP and changes clause. Air-A-Plane Corp. v. United States, 187 Ct. Cl. 269, 277-80, 408 F. 2d 1030, 1034-35 (1969).

 It may very well be — we do not have to decide — that, for the very limited purposes of tlie narrow contractual relief available under the GPP clause through the disputes mechanism, the Government’s role would be immaterial and the contractor would be entitled to an adjustment for changes in the item, without any showing of government responsibility for those changes.

 The factual findings and the evidence on which our legal conclusion in that case was rested were incorporated in the board’s opinion in the present case and are therefore an integral part of the Koppers/Clough administrative record.

 The board’s companion finding that the plaintiff was concurrently responsible for the same delay-period of 60 days is not entitled to acceptance (If relevant) since it was made gratuitously. Once a government act was properly found, concurrent delay on plaintiff’s part was Immaterial to the issue of whether a time-extension should be granted, or to any other matter within the board’s competence on that appeal. Cf. United States v. Utah Constr. & Mining Co., 384 U.S. 394, 419 n. 15 (1966) ; Hoel-Steffen Constr. Co. v. United States, 197 Ct. Cl. 561, 573-74, 456 F. 2d 760, 768 (1972).

 There may well be other pertinent board findings which lack finality either because gratuitous or because unsupported by substantial evidence. Conversely, there may be findings entitled to finality. The trial judge will have to make these judgments if there are disputes in the proceedings on remand as to the acceptability of various findings. We are thinking particularly of the board's finding that "there is no persuasive evidence that the restricted use of the pier during this period [i.e. December 15, 1966-June 10, 1967] caused any delay to completion of the job.” 71-2 BCA ¶8920 at 41,444. We do not now decide the status of that finding but leave it open.